Nicholas S. Cady (OSB # 114363)
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440
Tel: 541-434-1463
Fax: 541-434-6494
Email: nick@cascwild.org

Marianne Dugan, Attorney (OSB # 932563)
259 E. 5th Ave. Ste 200D
Eugene, OR  97401
Tel:  (541) 338-7072
Fax:  (866) 650-5213
mdugan@mdugan.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
MEDFORD DIVISION

| | |
|---|---|
| KLAMATH SISKIYOU WILDLANDS CENTER, an Oregon non-profit corporation; OREGON WILD, an Oregon non-profit corporation; and CASCADIA WILDLANDS, an Oregon non-profit corporation;<br><br>Plaintiffs,<br><br>v.<br><br>BUREAU OF LAND MANAGEMENT, an administrative agency of the United States Department of Interior,<br><br>Defendant. | Civil No. 1:17-cv-997<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF<br><br>Environmental Matter<br><br>(Violations of National Environmental Policy Act and Federal Land Policy and Management Act) |

## INTRODUCTION

1.       Plaintiffs, Klamath Siskiyou Wildlands Center, Oregon Wild and Cascadia

Wildlands, (collectively "Plaintiffs"), bring this civil action, arising under the Administrative

Procedure Act (APA), 5 U.S.C. §§ 701 et seq., challenging the United States Bureau of Land

Management's (BLM) issuance of the Lower Grave Vegetation Management Project (Lower

Grave) Environmental Assessment (EA)/Finding of No Significant Impact (FONSI) and

Decision Record for violations of federal laws and regulations intended to protect the public's

natural resources and ensure informed, well-reasoned decision-making.

    2.      This action seeks: 1) a declaration that BLM violated the National Environmental

Policy Act (NEPA), 42 U.S.C. §§ 4321 et seq., and its implementing regulations by: a) failing to

develop and analyze an adequate range of alternatives, specifically failing to consider any action

alternative aside from regeneration harvest of mature, dry-type Douglas-fir forest, b) failing to

take the requisite 'hard look' at the project's potential environmental impacts on northern spotted

owls, and c) failing to address significant new information related to red tree voles; 2) a

declaration that the BLM is violating the Medford District's Resource Management Plan (RMP)

by failing to properly survey for and manage known red tree vole nest sites in violation of

Federal Land Policy Management Act (FLPMA), 42 U.S.C. §§ 1701 et seq,; and 3) an injunction

prohibiting the BLM and its contractors, assigns, and other agents from proceeding with the

Lower Grave timber sale, unless and until this Court determines that the violations of law set

forth herein have been corrected.

    3.      The requested relief is necessary to preserve the status quo, to prevent illegal

agency action, and to forestall irreparable injury to the environment.

    4.      In the event that Plaintiffs are the prevailing party in this action, they will seek an

award of fees and costs pursuant to the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412.

<strong>JURISDICTION AND VENUE</strong>

    5.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 (federal

question), § 2201 (declaratory relief), § 2202 (injunctive relief), and 28 U.S.C. § 1346 (United

States as a defendant). This cause of action arises under the laws of the United States, including the APA, NEPA, the FLPMA and implementing regulations established pursuant to these federal statutes.  An actual, justiciable controversy exists between Plaintiffs and Defendant.  The requested relief is proper under 28 U.S.C. §§ 2201, 2202, 5 U.S.C. § 706.

6.      Venue is proper in this Court under 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, Defendant resides in this district, and the public lands, natural resources and agency records in question are located in this district.

7.      This case is filed properly in Medford, Oregon pursuant to Local Rules 3.2 and 3.3 because the Lower Grave timber sale is located within Josephine County, Oregon.

## PARTIES AND STANDING

8.      Plaintiff KLAMATH SISKIYOU WILDLANDS CENTER is a 501(c)(3) Oregon non-profit corporation based in Ashland, Oregon, dedicated to the preservation and restoration of biological diversity in the Klamath-Siskiyou region of southwestern Oregon and northern California.  KS Wild is committed to the ecological and biological integrity of late-successional forests and aquatic ecosystems in the region. Specifically, KS Wild has been heavily invested in the recovery of the northern spotted owl, a species dependent on the older forests of this region. KS Wild members and staff use and enjoy the public lands proposed for logging in the Grave Creek project area for dispersed recreation, wildlands studies, and to satisfy our human need for direct experience with primary forests.  KS Wild members hike, camp, bird watch, identify plants, and otherwise learn from the terrestrial and aquatic ecosystems in the project area where the timber sale and road construction activities are proposed.  The interests of KS Wild and its members wish to recreate under an intact forest canopy, hear songbirds, encounter rare plants

and animals, enjoy clear healthy streams, and experience unadulterated forest ecosystems. KS Wild and its members will be directly harmed by the BLM's timber sale activities within the project area.  KS Wild also has an organizational interest in providing its members and the general public with information that NEPA requires the BLM to compile and disclose in its environmental documents.  Members and staff of KS Wild enjoy reviewing these documents, understanding the agency's data and conclusions, and are very concerned with the environmental costs and tradeoffs involved in site-specific resource management decisions such as the one to log mature and late-successional forest stands via the Lower Grave timber sale.   These interests are adversely impacted by the BLM's failure to comply with NEPA.

9.    Plaintiff OREGON WILD is a non-profit corporation with approximately 20,000 members and supporters throughout the state of Oregon and the Pacific Northwest.  Oregon Wild and its members are dedicated to protecting and restoring Oregon's lands, wildlife, and waters as an enduring legacy.  Oregon Wild members use the forest areas comprising the Lower Grave timber sale area for hiking, recreation, bird watching, nature appreciation, and other recreational pursuits.  Oregon Wild's members will not have the ability to use and enjoy the Lower Grave timber sale area if it is logged. The interests of Oregon Wild and its members will be irreparably impaired if the Lower Grave sale is allowed to proceed without compliance with federal environmental laws.

10.    Plaintiff CASCADIA WILDLANDS is a non-profit corporation headquartered in Eugene, Oregon, with approximately 10,000 members and supporters throughout the United States.  Cascadia Wildlands educates, agitates, and inspires a movement to protect and restore wild ecosystems in the Cascadia Bioregion, extending from Northern California up into Alaska. Cascadia Wildlands envisions vast old-growth forests, rivers full of salmon, wolves howling in

the backcountry, and vibrant communities sustained by the unique landscapes of the Cascadia Bioregion. Cascadia Wildlands' members have used and will continue to use the Lower Grave timber sale area for activities such as hiking, bird watching, and other recreational and professional pursuits. Cascadia Wildlands' members will not have the ability to use and enjoy the Lower Grave timber sale area if it is logged. The interests of Cascadia Wildlands and its members will be irreparably injured if the Lower Grave timber sale is allowed to proceed without compliance with federal laws and regulations.

11.    Defendant BUREAU OF LAND MANAGEMENT is an agency of the United States and is a division of the Department of Interior. The Bureau of Land Management is charged with managing the lands and resources within Medford District in accordance and compliance with NEPA, FLPMA and other federal laws and regulations.

12.    An actual, justiciable controversy exists between Plaintiffs and Defendant.

13.    The aesthetic, recreational, scientific, educational, and other interests of the Plaintiffs and their members have been and will continue to be adversely affected and irreparably injured if Defendant continues to act and fails to act as alleged, affirmatively implementing the action that Plaintiffs challenge with this litigation.

14.    These are actual, concrete, and particularized injuries caused by Defendant's failure to comply with mandatory duties under NEPA, FLPMA and the APA. The relief sought in this Complaint would redress Plaintiffs' injuries.

## FACTUAL BACKGROUND

### Northern Spotted Owls, Red Tree Voles, and the Northwest Forest Plan

15.    The spotted owl occupies late-successional and old growth forest habitat from southern British Columbia through Washington, Oregon, and northern California. Spotted owls

rely on older forest habitats because they generally contain the structures and characteristics

required for the owl's essential biological functions of nesting, roosting, foraging, and dispersal.

These structures include: a multi-layered and multi-species tree canopy dominated by large

overstory trees; moderate to high canopy closure; a high incidence of trees with large cavities

and other types of deformities; numerous large snags; an abundance of large, dead wood on the

ground; and open space within and below the upper canopy for owls to fly.  Forested stands with

high canopy closure also provide thermal cover as well as protection from predation.

16.    Due to concerns over its widespread habitat loss and habitat fragmentation and

the lack of regulatory mechanisms to protect the species, the U.S. Fish and Wildlife Service

(FWS) listed the northern spotted owl as a threatened species under the Endangered Species Act

(ESA) on June 26, 1990. 16 U.S.C. § 1533(a); Determination of Threatened Status for the

Northern Spotted Owl, 55 Fed. Reg. 26,114 (June 26, 1990) (codified at 50 C.F.R. § 17.11(h)).

17.    The latest demographic data shows a continuing decline in the overall spotted owl

population at a rate of three percent every year.

18.    Critical habitat was designated for the species in 1992 and revised in 2008.

Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for the

Northern Spotted Owl; Final Rule, 73 Fed. Reg. 47,325 (Aug. 13, 2008).  In response to

litigation, a second revision of northern spotted owl critical habitat was prepared and finalized in

2012.  Endangered and Threatened Wildlife and Plants; Designation of Revised Critical habitat

for the Northern Spotted owl; Final Rule, 77 Fed. Reg. 71,876 (Dec. 4, 2012).

19.    In April 1992, the FWS issued a draft recovery plan for the northern spotted owl.

In 2008, the FWS issued a revised final recovery plan.  That recovery plan was challenged in

court, and the FWS subsequently published a final revised recovery plan for the owl on July 1,

2011.  Endangered and Threatened Wildlife and Plants; Revised Recovery Plan for the Northern

Spotted Owl (Strix occidentalis caurina), 76 Fed. Reg. 38,575 (July 1, 2011).  The 2011 Revised

Recovery Plan identified competition with barred owls and the ongoing loss of spotted owl

habitat as a result of timber harvest as two of the current leading range-wide threats to the

spotted owl's survival and recovery.

20.     Concerns over the continued viability of the spotted owl and other old growth

dependent species, and the years of controversy over management of their old-growth forest

habitat in the Pacific Northwest, led the Forest Service and BLM to develop regional forest

management standards and guidelines for these forests.  In 1991, upon uncovering "a remarkable

series of violations of the environmental laws," and "a deliberate and systematic refusal … to

comply with the laws protecting wildlife," a Washington district court issued an injunction

halting timber sales in old-growth forests on Forest Service land in western Oregon and

Washington.  Seattle Audubon Soc'y v. Evans, 771 F. Supp. 1081, 1089-90 (W.D. Wash.), aff'd,

952 F.2d 297 (9th Cir. 1991).  The following year, this Court enjoined BLM from proceeding

with further timber sales in old-growth forests pending compliance with NEPA.  Portland

Audubon Soc'y v. Lujan, 795 F. Supp. 1489 (D. Or. 1992), aff'd sub nom. Portland Audubon

Soc'y v. Babbitt, 998 F.2d 705 (9th Cir. 1993).

21.     To resolve the controversy in 1994, the Departments of Agriculture and Interior

jointly adopted the Northwest Forest Plan (NWFP) to help further the recovery of the spotted

owl and other species dependent upon late-successional forest.  The NWFP Record of Decision

(ROD) amended the land management plans for federal forests in western Oregon, Washington,

and northern California, including the Medford BLM District.  In 1995, the Medford District

amended its Resource Management Plan (RMP) to conform to the Northwest Forest Plan ROD.

As such, BLM is required to manage forestland under its jurisdiction according to the terms and requirements of the NWFP and the Medford District RMP.

22.    The NWFP includes a mitigation measure called the "Survey and Manage" program.  The Survey and Manage program is designed to mitigate the effects that logging and other ground-disturbing activities have on local populations of rare and uncommon late-successional species. The Survey and Manage program is considered to be a "foundational" component of the NWFP. In January 2001, the BLM and Forest Service jointly adopted a Record of Decision modifying certain requirements of the Survey and Manage program.  Record of Decision and Standards and Guidelines for Amendments to the Survey and Manage, Protection Buffer, and other Mitigation Measures Standards and Guidelines (2001).  The District Court for the Western District of Washington invalidated two subsequent agency decisions to entirely eliminate the Survey and Manage program.  Northwest Ecosystems v. Rey, Civ. No. 04-844P (W.D. Wash., Jan. 9, 2006) and Conservation Northwest v. Rey, 674 F. Supp. 2d 1232 (W.D. Wash., 2009).  Therefore, the 2001 Survey and Manage ROD remains operative.

23.    The red tree vole (Arborimus longicaudus) is among the uncommon species that are protected by the Survey and Manage program.

24.    The red tree vole is among the most arboreal mammals in the Pacific Northwest. As an arboreal mammal, the red tree vole lives most of its life in the forest canopy, rarely venturing down to ground level.  Red tree voles are endemic to the moist coniferous forests of western Oregon and extreme northwest California.  Red tree voles depend on conifer tree canopies for nesting and foraging.  Voles also use conifer tree canopies as travel routes, escape cover, and the canopy cover provides moisture for the species.  Red tree voles are closely associated with old growth forest habitat and are highly vulnerable to local extirpations from

habitat fragmentation or loss.  Additionally, the red tree vole is an important prey for the threatened northern spotted owl and other predators.

25.    Under the currently applicable Survey and Manage Standards and Guidelines, red tree voles are designated as a "Class C" species.  The Survey and Manage Standards and Guidelines provide the following objective for Class C species: Identify and manage high-priority sites to provide for reasonable assurance of species persistence.  Until high-priority sites can be determined, the Forest Service and BLM must manage all known sites.

26.    The Survey and Manage Standards and Guidelines further provide that until the agency issues a Management Recommendation addressing high-priority sites, the agency is to either 1) assume all sites are high-priority or 2) may, on a case-by-case basis, through local determination, supported by NEPA documentation and in accordance with specified criteria, designate a red tree vole site as "non-high priority."

27.    BLM's Management Recommendations for red tree voles do not address high priority sites.  Therefore, BLM must manage all known red tree vole sites or designate the site(s) as non-high priority in accordance with the Survey and Manage program's protocol referenced in paragraph 25.

28.    The Survey and Manage program requires BLM to conduct surveys at the project level prior to habitat-disturbing activities and in accordance with Survey Protocols.  If a confirmed, confirmed active or confirmed inactive nest is located, surveys should be conducted within 330 feet (100 meters) to determine the extent of the site. Sites found as a result of these surveys will be managed as high-priority sites in accordance with the Management Recommendations.

29.    Because of the red tree vole's reliance on continuous forest canopy cover and its

vulnerability to logging, and because of its natural role as prey for the threatened northern spotted owl, when red tree vole nests are found in a forest stand, BLM's Red Tree Vole Management Recommendations require a 10-acre minimum Habitat Area and a 100-meter buffer around active red tree vole nest sites. The size of a Habitat Area increases with the number of nests found in that forest stand.  BLM is generally prohibited from logging within Habitat Areas.

30.     Surveys must be conducted pursuant to approved survey protocols for each species.  The BLM and Forest Service have jointly developed a survey protocol for the red tree vole.  For the Lower Grave project, BLM relied upon version 2.1 of the Survey Protocol for the Red Tree Vole.

## The Lower Grave Timber Sale and Dry Forest Management

31.     The Lower Grave timber sale was planned in conformance with the NWFP and the Survey and Manage Standards and Guidelines.   The NWFP generally divided the forests into several different land allocations and under the Medford RMP, "are primarily allocated to Riparian Reserves, Late Successional Reserves, the Applegate Adaptive Management Area, Connectivity/Diversity Blocks and General Forest Management Areas."  The Lower Grave timber sale project area includes Riparian Reserves, Connectivity/Diversity Blocks, and General Forest Management Areas (GFMA).

32.     The Medford RMP due to its unique ecological make-up divides management of its GFMA into two separate regions Northern and Southern to reflect the moist, wetter forests in the northern portion of the Medford Districts and the dryer forests in the southern portion of the District:

> Matrix lands in the Medford District are divided into the northern general forest management area, the southern general forest management area, and connectivity/diversity blocks.  Collectively, these areas are referred to as the general forest management area.

33.    The difference between management of these two areas is significant.   Logging in the Southern GFMA is "designed to mimic natural ecological processes and meet species diversity, structural diversity, and landscape diversity objectives."  These assumedly dryer areas are managed less intensely with limitations on stand density reduction, maintaining pines and reserving more large conifer trees over twenty inches in diameter.  As such, regeneration harvests in dry areas are planned to have the "lowest practical cost," with "provisions for species diversity and long-term site productivity within the design" and "by the requirements of owl connectivity at the stand level."  Accordingly in the southern GFMA in regeneration harvest units, the BLM is required to retain at a minimum 16-25 large green trees per acre. A large tree is 20" diameter breast high or larger.

34.    Management of the Northern GFMA on the other hand permits "modified even-aged management" and resembles traditional clearcutting approaches to moist forests with requirements for regeneration harvest to retain only 6-8large trees per acre.

35.    Given that the  RMP dividing line does not perfectly separate moist/dry forests, "[t]he line dividing the northern and southern GFMAs is meant to be flexible.  Also, there will local situations in the northern GFMA that should be managed along southern GFMA prescription guidelines and visa versa."

36.    In December 2010, BLM commenced the second Western Oregon Plan Revision (WOPR) effort. The purpose of this second WOPR planning process was to withdraw BLM forests from the "comprehensive…common management approach to [federal] lands administered throughout the region" embodied in the Northwest Forest Plan."

37.    To inform this revision process and guide long-term planning on BLM lands in Oregon, the Secretary of the Interior directed the BLM Districts of southwest Oregon to develop

Demonstration Pilot Projects intended to demonstrate the application of "ecological forestry" principles developed by Drs. Jerry F. Franklin and K. Norman Johnson.  Pursuant to this Secretarial direction, BLM proposed a pilot project within each of the Medford, Roseburg, and Coos Bay BLM Districts of southwest Oregon.  Franklin and Johnson's management recommendations provide two different approaches to timber management based on whether the forest area is classified as either dry or moist.

38.    The Lower Grave project area is a dry forest type.  The Lower Grave project area contains dry forest tree species.  Dry forest types  are found in the interior stream valleys  from Roseburg to the state line..  On February 15, 2012, Drs. Franklin and Johnson produced a report addressing the Secretarial Pilot Projects on BLM lands in southwest Oregon, which includes a GIS based map showing that the Lower Grave project area is dry forest.  Southwest Oregon Secretarial Pilot Projects on BLM Lands: Our Experience So Far and Broader Considerations for Long-term Plans (February 15, 2012).  A similar map is incorporated by reference into the Oregon and California Land Grant Act of 2013, a bill introduced by Senator Ron Wyden to implement Franklin and Johnson's management proposals across federal land in Oregon. Map entitled "O&C Land Grant Act of 2013: Moist Forests and Dry Forests" and dated November 18, 2013.

39.    The Lower Grave project area is in both the Northern and Southern GFMAs.  The Lower Grave project area spans both north and south of Grants Pass.  The BLM states that the Lower Grave timber sale would adhere to the RMP prescriptions for the Northern GFMA. Plaintiffs contended throughout the administrative comment periods that the BLM should consider applying the RMP prescription for the Southern GFMA given the on-the-ground, dryer condition of the project area and Franklin and Johnson's management recommendations for dry

forests.  The BLM only considered one action alternative that applied the Northern GFMA prescription and did not consider an alternative for the project that applied the Southern GFMA prescription. Franklin and Johnson's management proposals for dry forests do not include regeneration harvests.  Franklin and Johnson's management proposals for dry forests generally involve retention of some dense forest patches on the landscape to provide for spotted owls and thinning other parts of the landscape, reducing stand densities by approximately 40%.  The BLM did not consider an alternative for the project that applied the prescriptions recommended and demonstrated by Franklin and Johnson.

40.    On April 24, 2015, BLM issued a draft environmental impact statement ("DEIS") for WOPR.  Given the condition of the project area, the regeneration harvest proposed within the Lower Grave timber sale would not be permitted in any of the action alternatives described in the DEIS. On April 15, 2016, BLM released the final EIS and proposed RMPs for the WOPR planning effort.  On August 5, 2016, the BLM signed the Record of Decisions ("ROD") implementing the proposed RMPs, including the 2016 Southwestern Oregon ROD/RMP that applies to the Medford BLM area.  The regeneration harvest proposed within the Lower Grave timber sale would not be permitted under the 2016 Southwestern Oregon ROD/RMP.  The 2016 Southwestern Oregon ROD/RMP eliminates Survey and Manage protections for red tree voles in the project area.

### Lower Grave Timber Sale, Owls, and Voles

41.    On February 7, 2013, BLM issued a notice describing the Lower Grave timber sale and soliciting scoping comments on the proposed action. Over 800 public comments were received on the proposed action, the vast majority stressing opposition to the logging of older forests targeted by the project.

42.     On February 23, 2013, Plaintiffs submitted scoping comments on the project highlighting some early concerns with the project and its location.

43.     On April 4, 2013, the BLM submitted a biological assessment to the U.S. Fish and Wildlife Service (FWS) pursuant to the ESA's consultation requirements for actions that may affect a federally listed species and/or its critical habitat.  Because BLM's biological assessments concluded that the Lower Grave timber sale was likely to adversely affect the northern spotted owl and the species proposed critical habitat, BLM requested the initiation of formal consultation with the FWS.

44.     On June 21, 2013, FWS released its first Biological Opinion on the project's effects and determined that the Lower Grave project was likely to adversely affect the spotted owl and its proposed critical habitat due to the loss of the owl's nesting, roosting, and foraging habitat (NRF) and dispersal habitat.  The FWS concluded that 109 acres of NRF habitat would be removed and another 109 acres downgraded.  The FWS also concluded that the project would remove or downgrade owl NRF habitat within specific spotted owl home ranges and core areas. Accordingly, the FWS concluded that the Lower Grave project would likely take up to eight owls, four adults and four juveniles.

45.     The BLM submitted another biological assessment to the FWS in October of 2014, which was withdrawn and replaced with a Biological Assessment dated January30, 2015 and amended with a supplement on May 19, 2015. The multiple revisions and amendments of BAs were caused in part by detections of spotted owls in timber sale areas thought to be unoccupied.

46.     On January 28, 2015, BLM's Medford District Office issued the Lower Grave Vegetation Management Project Environmental Assessment (EA). The EA analyzed two

alternatives: a No-Action alternative and the proposed Action Alternative.

47.     On February 26, 2015, Plaintiffs submitted comments on the EA.

48.     On April 17, 2015, spotted owl surveyors located a new active spotted owl site in the proposed logging units of the Lower Grave project.  On May 19, 2015, the BLM notified the FWS of the new owl site. The FWS released a second Biological Opinion dated June 1, 2015.

49.     The June 2015 Biological Opinion again concluded that the Lower Grave project would adversely affect the spotted through removing and downgrading spotted owl nesting, roosting, and foraging habitat and by removing nesting, roosting, and foraging habitat in designated critical habitat for the spotted owl.  Pursuant to the June Opinion, the Lower Grave project is anticipated to remove 63 acres of NRF habitat and downgrade 34 acres of NRF habitat. The FWS again anticipated adverse effects to three distinct spotted owl nest sites, and that the proposed action will decreased NRF habitat amounts at the home range and core-use area scales as much as 10 percent.  The FWS concluded the proposed action will remove or downgrade about 97 acres of NRF habitat, of which 84 acres overlap two known spotted owl home ranges. The FWS concluded that the Lower Grave project would significantly disrupt the breeding, feeding, or sheltering behavior of the spotted owl to the extent that it actually injures or kills affected spotted owls and result in the take of one breeding pair of owls and its juveniles, estimated to be one and half juveniles.

50.     The BLM did not revise the environmental assessment for the Lower Grave project following these new findings, where it assumed that "NSO detections have not occurred within the proposed forest treatment units on BLM-managed lands. It is likely that foraging occurs within the proposed units, however, the proposed treatment area lacks complex structure and foraging use would be minimal."  The EA failed to disclose that logging would occur in an

occupied nest patch. The EA failed to disclose that the logging will take a pair of nesting owls and its juveniles. The BLM failed to disclose in the EA impacts to northern spotted owls.

51. On July 29, 2015, BLM issued a Finding of No Significant Impact (FONSI) and Decision Record for the Lower Grave Vegetation Management Project selecting the single action alternative. According to the FONSI, the selected action calls for logging on approximately 582 acres of Matrix and Riparian Reserve Land Use Allocations and 2.42 miles of new permanent and temporary road construction.

52. On August 13, 2015, Plaintiffs jointly submitted a protest of the Lower Grave EA/FONSI and Decision Record.

53. In April of 2015, spotted owls were detected in the project area in new locations. The BLM altered its management units in response to this new information but it did not revise its NEPA analysis. BLM did submit an amended BA to USFWS on May19, 2015

54. BLM denied Plaintiffs' protest on April 12, 2017.

55. On May 11, 2017, Plaintiffs jointly submitted an administrative appeal of the EA/FONSI and Lower Grave Vegetation Management Project Decision Record to the Interior Board of Land Use Appeals (IBLA).

56. Pursuant to the EA, the Lower Grave project will log and build new roads within old-growth forest stands up to 250 years of age. In addition to these old growth stands, large old-growth trees will be logged in the Lower Grave project. Forests up to 160 years in age will be regeneration harvested in the Lower Grave project. 228 acres of mature forests and/or forests over 80 years of age will be logged in the Lower Grave project.

57. According to the June 2015 Biological Opinion, "the Service concludes that the Lower Grave proposed action is likely to incidentally take 2 adult (one pair) spotted owls plus

1.5 juveniles."  The Lower Grave timber sale will remove 63 acres of NRF with regeneration

harvest and downgrade 34 acres of NRF habitat for the northern spotted owl.  The Lower Grave

timber sale will remove large diameter trees that provide spotted owl nesting structure, remove

mid-story trees that provide hunting perches, and reduce canopy closure to below 60 percent.

This habitat loss will adversely affects spotted owls.

58.     The FWS suggests that the spotted owl generally requires at least 60-70% canopy

cover for NRF habitat and at least 40% canopy cover for dispersal habitat.

59.     In December 2012, the FWS designated the lands affected by the Lower Grave

timber sale as critical habitat for the spotted owl because it determined that the area contains the

physical or biological features essential to the conservation of the species and may require

special management considerations or protection.  Final Rule, 77 Fed. Reg. 71,876 (Dec. 4,

2012).

60.     The Lower Grave timber sale logging will downgrade 9 acres of NRF critical

habitat, treat and maintain 171 acres of NRF critical habitat and treat and maintain 268 acres of

Dispersal habitat. The Lower Grave timber sale is likely to adversely affect spotted owl critical

habitat.

61.     The spotted owl recovery plan, specifically Recovery Action 10 requires agencies

"conserve spotted owl sites and high value spotted owl habitat to provide additional

demographic support to the spotted owl population" in order to recover spotted owls.  The Lower

Grave timber sale is anticipated to take spotted owls and eliminate the juveniles therein.  The

Lower Grave timber sale will log within the nest core and home range of an occupied spotted

owl nest site.  The Lower Grave timber sale is not fully consistent with Recovery Action 10 as

purported in the EA because it resulted in take determination.

62.    Red tree voles are also known to occupy habitat within the project area.  BLM conducted surveys for red tree voles in May 2013 over 1,170 acres in forest stands over 80 years old.  The surveys detected 55 active red tree vole nests, 50 inactive red tree vole nest, 14 vole nest sites within undetermined activity status, and 162 unknown potential vole nests. Three nest sites were detected within harvest units. The BLM designated these three nest sites as "non-high priority" sites to facilitate logging in these areas.

63.    Following the BLM surveys and identification of nest sites, the BLM did not conduct follow up surveys and/or climbing to determine the extent of these nest sites. After identifying active and inactive nest site, the BLM did not conduct surveys within 330 feet (100 meters) to determine the extent of the site. Plaintiffs alerted the BLM in the comment period for the Lower Grave project that numerous red tree vole sites, including those marked from prior survey efforts in 2003 and nests visible from the ground were missed by the BLM surveys.

64.    On September 15, 2015, following the July 19, 2015 Decision Record on the Lower Grave project, Northwest Ecosystem Survey Team (NEST) submitted to the BLM red tree vole survey results from the Lower Grave project area.  NEST's survey results were also provided to the FWS. These surveys followed up on Plaintiffs' concerns that numerous nest sites were overlooked by the BLM.  NEST reported 15 nest site locations to the BLM complete with coordinates, photos, resin ducts samples, and NEST's notes and assessments on each site. Citizen survey efforts for red tree voles are permissible and common throughout western Oregon.  The tree climbing provides recreational opportunities for the public, and the volunteer surveying helps supplement agency survey efforts, which even when conducted to protocol, only cover a portion of the project area.  Red tree vole sites identified and reported by qualified members of the public should be treated like known sites identified by the agency and its agents.

65.     On October 1, 2015, the FWS contacted the BLM regrading NEST's submitted data and asked the BLM if it was planning on updating its Non-High Priority Site determination for the Lower Grave Vegetation Management Project based upon the submitted NEST data.  The FWS also asked if the BLM received official concurrence from the Forest Service on its non-high priority determination.

66.     On November 4, 2015, the BLM's wildlife biologist released a review of NEST's data and concluded that based upon the evidence provided that many of the sites were likely red tree vole nests sites either active or inactive.  On February 19, 2016, the BLM field checked NEST's data submission and concluded that there were 14 new red tree vole nest sites undisclosed in BLM's NEPA documents or disclosed to the FWS in its Non-High Priority Site analysis.  Nine of these sites were within Unit 03-2A, one of the regeneration harvest units, and three of the nine sites were separated by more than 100 meters.  This separation indicates that under the vole's management recommendations, each of these sites would necessitate distinct 10 acre buffers.

67.     On June 2, 2016, the BLM responded to the FWS's request for information.  The BLM stated it would not update its Non-High Priority Site determination, nor will the BLM update its Lower Grave Decision Record or alter the timber sale units.  The BLM did not update its Non-High Priority Site determination in response to NEST's data and its verification of that data.  The BLM did not update the Lower Grave Decision Record in response to NEST's data and its verification of that data.  The BLM did not alter the Lower Grave timber sale units in response to NEST's data and its verification of that data.   The BLM did not receive formal Non-High Priority Site concurrence from the Forest Service. The BLM did not disclose or analyze NEST's survey results or its verification of those survey results in any NEPA document.

NEST's reported sites, verified by the BLM, are known sites.

## FIRST CLAIM FOR RELIEF
## VIOLATIONS OF NEPA

68.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

69.    NEPA and its implementing regulations require federal agencies to take a hard look at the environmental consequences of proposed actions and the reasonable alternatives that would avoid or minimize such impacts or enhance the quality of the human environment.  See 42 U.S.C. § 4332(2)(C)(i); 40 C.F.R. Parts 1502 and 1508.

70.    NEPA also requires an agency to prepare a supplemental NEPA analysis when "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns; or. . .[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed actions or its impacts."  40 C.F.R. § 1502.9(c)(1).

71.    An EA must be supplemented if there remains major federal action to occur and the new information shows that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered.  Marsh, 490 U.S. at 374.  At the very least, the agency must take the time to evaluate the information to determine whether or not it is of such significance as to require supplementation.  See Warm Springs Dam Task Force v. Gribble, 621 F.2d 1017, 1024 (9th Cir. 1980) ("When new information comes to light the agency must consider it, evaluate it, and make a reasoned determination whether it is of such significance as to require an [SEIS].").

72.    BLM has violated NEPA and its implementing regulation through issuance of the Lower Grave Vegetation Management Project EA/FONSI and Decision Record.  These violations include, but are not limited to:

a)      Failing to thoroughly consider and objectively evaluate an adequate range of alternatives, including an alternative that would meet timber objectives by regeneration harvesting pursuant to the Southern GFMA requirements or commercially thinning these dry forest stands consistent with the management recommendations of Drs. Johnson and Franklin and the 2016 Southwestern Oregon ROD/RMP.  BLM failed to consider any action alternative other than one that included the regeneration harvest of mature, dry-type forests and the take of northern spotted owls despite reasonable recommendations from Plaintiffs that satisfied the project's purpose and need;

b)      Failing to supplement its NEPA analysis based upon significant new circumstances or information relevant to the environmental impacts including but not limited to new spotted owl sites, known red tree vole nest sites verified by the BLM, and the elimination of the Survey and Manage program and fundamental alteration of the reserve network on BLM land by the 2016 Southwestern Oregon ROD/RMP.  Both these issues are not addressed in the BLM's NEPA documents or in its Non-High Priority Site analysis relied upon by the BLM in order to circumvent its requirements under Survey and Manage; and

c)      Otherwise failing to take the requisite hard look at the project's impacts, particularly on the northern spotted owl.

73.    BLM's decision to implement and proceed with the proposed action without first analyzing an adequate range of alternatives, failing to supplement its analysis based on significant new circumstances and information, and otherwise taking the requisite hard look at the project's potential environmental consequences is arbitrary, capricious, and not in

compliance with NEPA and must be reversed and remanded for the reasons identified above.  5
U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF
## FLPMA VIOLATION

74.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

75.    Pursuant to the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C.
§ 1732(a) and its implementing regulations, 43 C.F.R. § 1610.5-3(a), BLM must ensure that a
site-specific project conforms to the Resource Management Plan (RMP) including any
alterations or amendments thereto.  The Northwest Forest Plan (NWFP) and the Survey and
Manage Program are incorporated into the 1995 Medford District RMP.

76.    BLM is required to comply with the requirements of the Survey and Manage
program, the agency's Red Tree Vole Management Recommendations and Survey Protocol
before implementing the Lower Grave timber sale.

77.    BLM failed to manage known sites confirmed by BLM staff.  BLM failed to
create Management Areas to protect red tree vole sites outside the unit it designated as non-high
priority.  BLM failed to manage all known red tree vole sites and/or sites assumed to be high-
priority.  BLM's failed to implement and follow the requirements of the agency's own Red Tree
Vole Management Recommendations.

78.    BLM failed to conduct follow up 100 meter surveys for the active and inactive
sites identified during the BLM's transect surveys to determine the full extent of the red tree vole
sites prior to requesting Non-High Priority Site designation and reaching a decision on the
Lower Grave project.  BLM failed to properly implement and follow the requirements of the
NWFP's Survey and Manage program and the agency's own Red Tree Vole Survey Protocol.

79.    BLM's failure to implement and follow the requirements of the NWFP's Survey

and Manage program is a violation of FLPMA and is arbitrary and capricious. 5 U.S.C. §

706(2)(A).

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

1.      Declare that BLM violated the National Environmental Policy Act, the Federal

Land Policy and Management Act, the Administrative Procedure Act, and their implementing

regulations in analyzing and authorizing the Lower Grave Vegetation Management Project

EA/FONSI and Decision Record;

2.      Vacate the Lower Grave Vegetation Management Project EA/FONSI and

Decision Record;

3.      Order BLM to withdraw the Lower Grave Vegetation Management Project

EA/FONSI and Decision Record until such time as the agency demonstrates to this Court that it

has adequately complied with the law;

4.      Enjoin BLM and its agents from proceeding with the Lower Grave Vegetation

Management Project, or any portion thereof, unless and until the violations of federal law set

forth herein have been corrected to the satisfaction of this Court;

5.      Award Plaintiffs their costs of suit and attorneys fees; and

6.      Grant Plaintiffs such other and further relief as the Court deems just and

equitable.

Respectfully submitted this 27th day of June, 2017.


　　　　　　　　　　　 /s/  Nicholas S. Cady
                        Nicholas S. Cady (OSB # 114363)
                        Cascadia Wildlands
                        P.O. Box 10455

Eugene, Oregon 97440
Tel: 541-434-1463
Fax: 541-434-6494
Email: nick@cascwild.org

  /s/  Marianne Dugan
Marianne Dugan, Attorney (OSB # 932563)
259 E. 5th Ave. Ste 200D
Eugene, OR  97401
Tel:  (541) 338-7072
Fax:  (866) 650-5213
mdugan@mdugan.com

Of Attorneys for Plaintiffs