IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

**KLAMATH SISKIYOU WILDLANDS
CENTER**, *et al.*,

                                 Case No. 1:17-cv-00997-CL

               Plaintiffs,

      v.                            **REPORT AND
RECOMMENDATION**

**BUREAU OF LAND MANAGEMENT**, *et al.*,

               Defendants.

**MURPHY COMPANY**,

               Defendant-Intervenor.

_____

CLARKE, Magistrate Judge.

This case comes before the Court on cross-motions for summary judgment (##31, 33,

34). Murphy Company has intervened as a defendant as the highest bidder on the timber sale,

and the American Forest Resource Council has filed an amicus brief. Plaintiffs have also filed a

Request for Judicial Notice (#52).

Plaintiffs challenge the Bureau of Land Management's (BLM) Lower Grave timber sale

decision, claiming that the decision violated the National Environmental Policy Act (NEPA), the

Federal Lands Policy and Management Act (FLPMA), and the Administrative Procedures Act

(APA). For the reasons below, the Plaintiffs' motion (#31) should be GRANTED in part and

DENIED in part. Similarly, the defendants' and defendant-intervenor's motions (## 33, 34)

should be GRANTED in part and DENIED in part.  Plaintiffs' Request for Judicial Notice (#52)

is DENIED.   The BLM's Lower Grave timber sale decision should be remanded to the BLM for

consideration of a reasonable range of alternatives under NEPA. Plaintiffs' other challenges to

the project should be dismissed.

## BACKGROUND

The Lower Grave Vegetation Management Project ("Lower Grave project," the "project,"

or "Lower Grave") occurs within a portion of the Grave Creek watershed, north of Grants Pass

and east of I-5 and the community of Sunny Valley. AR 9829.  Its purpose is to implement forest

management activities that improve forest health and vigor and reduce wildfire danger while

providing a sustainable supply of timber and other forest commodities. AR 9833.

Within an overall planning area of 22,841 acres, the project authorizes commercial timber

harvest of 582 acres and non-commercial hazardous fuels reduction treatments of another 378

acres. AR 2885, 9829. The project's commercial thinning occurs in "previously entered

plantations that have typically seen multiple management treatments." AR 9840. The project

also authorizes construction of 0.31 miles of permanent routes and temporary construction or

reconstruction of just over 2 miles of additional routes. AR 2885.

The project occurs on lands governed by the Oregon and California Lands Act ("O & C

Act"), 43 U.S.C. § 2601 et seq. AR 2908.  Such lands are intended primarily "for timber

production to be managed in conformity with the provision of sustained yield." *O'Neal v. United

States*, 814 F.2d 1285, 1287 (9th Cir. 1987) (*per curiam*). "[T]he O & C Act envisions timber

production as a dominant use. " *Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1184 (9th Cir. 1990).

Eighty-six percent (86%) of the project's acreage is on "Matrix" lands. AR 2892.  Matrix lands

were designated by the 1994 Northwest Forest Plan ("NWFP") and comprise the area "in which

most timber harvest and other silvicultural activities will be conducted." AR 25980. The NWFP recognizes that Matrix lands were designated to emphasize "the economic and social benefit of timber harvest." AR 26023. Under the Medford RMP, BLM's primary management objective for Matrix lands is "to produce a sustainable supply of timber and other forest commodities to provide jobs and contribute to community stability." AR 2900, 24750.

In February 2013, BLM provided the public with initial information about the proposed project and held a public meeting and field trip. AR 9834, 15129-34, 15016-43 (slide presentation from public meeting). As originally proposed, the project would have involved more than 1,900 acres of thinning and other forest treatments, including about 120 acres of regeneration harvest. AR 15132. BLM requested, received, and responded to the initial public comments about the project. AR 9834, 10044-56 (BLM responses to initial comments).

In January 2015, BLM published an Environmental Assessment ("EA") for the project and provided the public a 45-day comment period. AR 9821- 22. The 240-page EA included analysis and disclosure of the environmental effects of both a "no-action" alternative and the proposed action. AR 9862-970.

On July 30, 2015, BLM issued a Decision Record for the project that authorized timber harvest and forest treatments on a total of 960 acres, about half of what BLM had initially proposed. AR 2887-94. BLM also formally responded to public comments on the EA and issued a Finding of No Significant Impact ("FONSI"). AR 2895-934.

On August 13, 2015, Plaintiffs filed an administrative protest of the Decision Record under 43 C.F.R. § 5003. AR 2533-80. On April 12, 2017, BLM issued a 42-page decision that denied Plaintiffs' protest. AR 268-310. On May 11, 2017, Plaintiffs filed an administrative appeal of BLM's protest decision with the Interior Board of Land Appeals ("IBLA"). AR 157-

95.  On July 3, 2017, IBLA issued a decision affirming BLM's decision on its merits. AR 20-39.

The IBLA decision constituted "final agency action." 43 C.F.R. § 4.403(a). On December 6,

2017, BLM issued a Determination of NEPA Adequacy ("DNA") to take into account new owl

and vole information with regard to the project.  DNA 1-7. BLM found that further NEPA

review was not warranted because the new information did not rise to a level of significance.  *Id.*

On June 27, 2017, Plaintiffs filed their initial complaint (#1) in this Court against BLM.

On November 7, 2017, Plaintiffs filed a first amended complaint (#14) to name IBLA as a

defendant. On February 9, 2018, Defendants lodged the administrative records on a disc (#26).

The documents with the prefix "AR" comprise IBLA's administrative record for its challenged

July 2017 decision. (*See* #28). The documents with the prefix "DNA" comprise the

administrative record for BLM's December 2017 DNA, which relate to Plaintiffs' supplemental

NEPA claim. (*See* ##26, 27).

## LEGAL STANDARDS

### I.    Administrative Procedure Act

Judicial review of agency decisions under NEPA and FLPMA is governed by Section

706 of the Administrative Procedure Act ("APA") and may be resolved through motions for

summary judgment. *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205 (9th Cir.2004) ( "Because

the statutes ... do not contain separate provisions for judicial review, our review is governed by

the APA"); *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 964 (9th Cir.2002) ("We

review claims brought pursuant to ... NEPA under the standards set out in the [APA]").

The APA allows the reviewing court to set aside a final agency action only if it is

"arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with the law." 5

U.S.C. § 706(2)(A). "A decision is arbitrary and capricious if the agency 'has relied on factors

which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm'n*, 92 F.3d 940, 942 (9th Cir. 1996) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). An agency action is also arbitrary and capricious if the agency fails to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

Review under the APA is "searching and careful." *Ocean Advocates v. United States Army Corps of Eng'rs*, 402 F.3d 846, 858 (9th Cir. 2004). The court must ensure that the agency took a "hard look" at the environmental consequences of its proposed action. *Oregon Natural Resources Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997). However, the court may not substitute its own judgment for that of the agency. *Ocean Advocates*, 402 F.3d at 858. It must presume the agency acted properly and affirm the agency when "a reasonable basis exists for its decision." *Independent Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000).

## II.    National Environmental Policy Act

NEPA is "'our basic national charter for protection of the environment.'" *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 993 (9th Cir.2004) (quoting 40 C.F.R. § 1500.1(a)). It is a procedural statute that requires federal agencies, such as the BLM, to assess the environmental consequences of major actions before those actions are undertaken. *Id.* at 993. NEPA has two purposes: (1) to ensure that federal agencies take a "hard look" at environmental consequences to agency actions, and (2) to guarantee that the public has access to relevant

information. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). NEPA is

accompanied by implementing regulations promulgated by the Council on Environmental

Quality ("CEQ"), found at 40 C.F.R. §§ 1501.1–1508.28.

If a federal agency determines that a proposed action will significantly affect the

environment, NEPA generally requires the agency to prepare an EIS. 42 U.S.C. § 4332(c);

*Klamath–Siskiyou Wildlands Ctr.*, 387 F.3d at 993. To determine if the environmental impact of

a proposed action is significant enough to warrant an EIS, federal regulations permit an agency

to conduct a less-exhaustive Environmental Assessment. *Id.*; 40 C.F.R. § 1508.9. An EA is a

"concise public document that briefly provide[s] sufficient evidence and analysis for determining

whether to prepare an environmental impact statement or a finding of no significant impact." *Id.*

An EA must "include brief discussions of the need for the proposal, or alternatives [to the

proposed action], [and] of the environmental impacts of the proposed action and alternatives." *Id.*

In this analysis, the agency preparing an EA must consider "the direct, indirect, and cumulative

impacts of the action." *Ctr. For Envtl. Law & Policy v. U.S. Bureau of Reclamation*, 655 F.3d

1000, 1006 (9th Cir.2011) (citations omitted). If the agency determines that an EIS is not

required, the agency may issue a Finding of No Significant Impact ("FONSI") and then proceed

with the action. 40 C.F.R. §§ 1501.4(e), 1508.13.

### III.    Federal Land and Policy Management Act

The FLPMA establishes standards for public land use planning and obligates the BLM to

manage its lands under principles of multiple use and sustained yield. 43 U.S.C. § 1732(a);

*Public Lands Council v. Babbit*, 167 F.3d 1287, 1301 (10th Cir.1999), aff'd, 529 U.S. 728

(2000). FLPMA requires the Secretary of the Interior to "develop, maintain, and, when

appropriate, revise land use plans which provide by tracts or areas for the use of the public lands." 43 U.S.C. § 1712(a).

In accordance with FLPMA, the BLM is required to conduct district-level planning to guide public land maintenance and development. The district-level plan in this case, the 1995 Medford District Land RMP, as amended by the Northwest Forest Plan Record of Decision ("NWFP ROD"), implements the FLPMA. The NWFP ROD was issued by the BLM and the U.S. Forest Service ("USFS"). It establishes management requirements for all BLM and USFS lands within the range of the northern spotted owl and includes Standards and Guidelines which must be followed. Failure of a project to comply with the RMP is a violation of FLPMA and its implementing regulations. *Klamath–Siskiyou Wildlands Center v. Medford Dist. of BLM*, 400 F.Supp.2d 1234, 1241 (D.Or.2005). FLPMA gives the BLM "a great deal of discretion in deciding how to achieve" such compliance. *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 66 (2004).

## DISCUSSION

### 1. The BLM did not fully comply with NEPA.

Plaintiffs argue that the BLM violated NEPA because it (a) failed to consider a reasonable range of alternatives; (b) failed to supplement NEPA in response to a newly established northern spotted owl nest site within the project area; and (c) failed to take a "hard look at effects of the project on the northern spotted owl regarding an alleged pattern of overharvest in recent, similar projects. The Court agrees that the BLM failed to consider a reasonable range of alternatives, but it does not agree with Plaintiffs' other two NEPA claims. For the reasons below, this case should be remanded to the BLM for consideration of a reasonable range of alternatives under NEPA.

**(a) The BLM failed to consider a reasonable range of alternatives.**

NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action." 42 U.S.C. § 4332(2)(E). This provision applies whether an agency is preparing an EIS or an EA. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1245 (9th Cir.2005). "[C]onsideration of alternatives is critical to the goals of NEPA even where a proposed action does not trigger the EIS process." *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1228–29 (9th Cir.1988). "However, an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS." *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 915 (9th Cir.2012) (quoting *Native Ecosys. Council*, 428 F.3d at 1246). "Where with an EIS, an agency is required to 'rigorously explore and objectively evaluate all reasonable alternatives,' *see* 40 C.F.R. § 1502.14(a), with an EA, an agency is only required to include a brief discussion of reasonable alternatives." *Salazar*, 695 F.3d at 915 (quoting *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir.2008)).

For an EA, an agency need not discuss "alternatives similar to alternatives actually considered, or alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives for management of the area." *Bering Strait*, 524 F.3d at 955 (internal citation omitted). Additionally, an agency has discretion to determine which alternatives to analyze in-depth. *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 425 U.S. 519, 551–52 (1978). Although an EA must discuss one or more alternatives, such discussion need only be "brief" under the regulations. 40 C.F.R. § 1508.9; *see also Native Ecosys. Council*, 428 F.3d 1233.

Nevertheless, "[t]he existence of a viable but unexamined alternative renders an [EA] inadequate." *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013) (quoting *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004)). Viable

alternatives are feasible, meet the stated goals of the project, or are reasonably related to the purposes of the project. *See id.* at 1052 ("Feasible alternatives should be considered in detail.")

> **i.**  **Consideration of a proposed action and a no-action alternative does not meet NEPA requirements in this case.**

NEPA and its implementing regulations require an agency to consider a "no-action alternative." 40 C.F.R. § 1502.14(d). The question here is whether that no-action alternative satisfies NEPA's requirement to consider "appropriate alternatives to recommended courses of action." 42 U.S.C. § 4332(2)(E).

The Ninth Circuit has clearly held that an agency's obligation to consider alternatives in an EA may be satisfied by detailed consideration of only two reasonable alternatives, including the preferred action alternative and the no-action alternative. *Native Ecosys. Council,* 428 F.3d at 1246 (NEPA "does not impose a numerical floor on alternatives to be considered"). The more pertinent question here, however, is whether it always satisfies that obligation. In this case, considering the stated purposes and goals of the project to manage forest lands, improve forest health and fire resiliency, and provide sustainable timber harvest, a no-action alternative that does absolutely none of those things cannot be considered reasonable.

The seminal case considering this issue in the Ninth Circuit is *Native Ecosystems Council v. U.S. Forest Service,* 428 F.3d 1233. There, the Forest Service considered a total of six alternatives, four of which were raised but rejected without detailed consideration. *Id.* at 1246. Two – a no-action alternative and the preferred alternative – were the focus of the EA and given detailed consideration. *Id.* In reviewing the substance of these two alternatives, the court first considered the stated purpose for the project, and then it considered whether the Plaintiff's proposed alternative was reasonable. *Id.* at 1247-8. The court did not specifically address whether the no-action alternative was reasonable, but it did note that the Plaintiff's proposed

alternative, which was not considered by the agency, would have been "redundant" due to the

similarities between it and the no-action alternative. *Id* at 1248-9 ("Native Ecosystems's

proposed alternative also would have been redundant. The DN/FONSI makes clear that if Native

Ecosystems wanted an alternative that did not involve amending the Helena National Forest Plan

and moved the project area closer to compliance with the current hiding cover/road density

standard, it got one – the 'no action' alternative.")

More recently, the Ninth Circuit considered whether an agency's EA considered a

reasonable range of alternatives by analyzing a no-action alternative and a proposed action, the

implementation of incidental take regulations. *Center for Biological Diversity v. Salazar*, 695

F.3d 893 (9th Cir. 2012). The EA described the projected impacts of the no-action alternative:

> If this alternative is implemented, no [incidental take regulations]
> would be issued. Consequently, any takes resulting from the
> proposed exploration activities would not be authorized and any
> incidental takes would be a violation of the MMPA. However,
> because the [regulations] do not explicitly permit or prohibit oil and
> gas activities, Industry could continue to conduct exploration
> activities as planned without the benefit of mitigation measures
> proposed by the Service. In that event, the Service would have no
> formal means of communicating with Industry or have the ability to
> require monitoring and mitigation of specific activities and any form
> of "take" would be a violation of the Act.

*Id.* at 915. The plaintiffs challenged the agency's assumptions underlying this description, but

the court found that it was a reasonable discussion of the projected effects. *Id.* Thus, while the

agency made it clear that the no-action alternative was not the preferred alternative, it was a

viable and reasonable alternative that was discussed and considered in depth by the agency.

In this case, the IBLA review of the BLM's decision discussed the unfeasibility of the no-

action alternative, stating that the effects to forest stand conditions indicate that "units would

continue to be overstocked and pre-disposed to insect and disease outbreaks and/or stand

replacing wildfire (EA p. 48)." AR 0273. The BLM itself noted, in rejecting the no-action alternative, that it would not meet the purpose and need of the project: "Under the No Action Alternative, reductions in stand density would not occur, stand and tree development would not be maintained on a desired trajectory, naturally occurring fuel loading would not be reduced, and an economically feasible harvest entry would not be achieved. The No Action Alternative would not produce a sustainable supply of timber and other forest commodities in conformity with the principles of sustained yield and to distribute timber receipts to O&C counties (EA, p. 9)." AR 2689. Essentially, the no-action alternative met none of the stated goals and purposes of the project.

By all indications, the no-action alternative was unfeasible and, ultimately, not a reasonable alternative. This conclusion is confirmed by the fact that no one in this case disputes that some forest management action on the land in question must take place. Even the Plaintiffs and other environmental groups agree that some thinning and logging is appropriate for the area. On such a record, the BLM's consideration of one preferred action and a no-action alternative does not satisfy NEPA's bare requirement for a brief discussion of reasonable alternatives because the no-action alternative was not in fact reasonable.

ii.     **Discussion of an Ecological Forestry alternative would have satisfied NEPA requirements for consideration of reasonable alternatives.**

As discussed above, for an EA, an agency need not discuss alternatives similar to alternatives actually considered, or alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives for management of the area. Feasible alternatives which meet the stated goals of the project should be considered in detail.

In challenging the BLM's preferred alternative, Plaintiffs' primary focus is on a proposed Ecology Forestry alternative, which they claim has been successfully implemented by the

Medford BLM in other dry forests. [1] AR 2537.   Plaintiffs suggested an Ecological Forestry alternative in public comments to the proposed project.

The BLM noted in response to these public comments that an Ecological Forestry approach satisfies the same or similar goals as the proposed Lower Grave project.  AR 2704. Defendant's brief confirms this, asserting that BLM "reasonably found that assessing a full Ecological Forestry alternative was not needed because BLM's proposed action overlapped with the goals and strategies of Ecological Forestry." Def Cross-Motion (#34) p. 16 (citing AR 281, "noting that the project proposed Ecological Forestry principals where appropriate."). Overlapping goals and strategies do not necessarily mean that the proposed alternatives are similar, however.

The primary difference between Plaintiffs' Ecological Forestry suggestion and the BLM's preferred action alternative is that a dry-forest project would retain more of the older, residual legacy trees (trees over 150 years in age).  Plaintiffs claim this would increase stand resiliency in the face of a fire. AR 1720.  By contrast, BLM's proposed regeneration harvest would leave only 6-8 trees per acre and would, in the short-term, increase fire hazard. AR 2697 ("As the stand develops it would represent a shrub fuel model with an increased fire behavior potential as vegetation occupies the site."). The BLM noted that fire resiliency will improve over time, but it acknowledged that the agency will have to go back into this area to reduce fire hazard in the future. *Id.* ("As these forest stands mature (TU or TL fuel models), fire behavior would decrease and fuel loading and ladder fuels would be reduced through Silviculture practices.").

---

[1] Plaintiffs claim that not only would such an alternative minimize owl impacts, retain more old-growth legacy trees, eliminate traditional regeneration harvest, and generate a sustainable amount of commercial timber, it would also specifically cater to the dry nature of the project area and reduce, rather than increase, fire risk. *Id.* The Court refrains from considering or commenting on the substantive merits of these goals, but it acknowledges that, as discussed below, they seem to overlap with the stated purpose and needs of the project at issue in this case.

This difference, though it may only apply to a small portion of the project overall, represents a distinct alternative that should be fully discussed in the public sphere unless the BLM has determined that it is unfeasible, ineffective, or inconsistent with other policy objectives.

Without explicitly stating that an Ecological Forestry alternative would be unfeasible,[2] ineffective, or inconsistent with other policy objectives, the other responses given by the BLM, both to public comments and to the Court, imply that was rejected because it would not yield as much timber harvest as the preferred action. *See* AR 280-81 (defending regeneration harvest as appropriate under the 1995 Medford RMP); and AR 2873 (stating in response to public comment, "The 1995 RMP does not require the analysis of an Ecological Forestry Alternative," and going on to explain, "The RMP directs proposals on the Matrix land use allocation to produce a sustainable supply of timber and other forest commodities to provide jobs and contribute to community stability."). Of course, the project needs to provide a certain level of timber harvest and yield to make the project economically viable to the timber industry, and to meet the stated purpose of the project, but there is no indication in the record of what that optimal level is, nor what the economic difference would be between the regeneration harvest treatment and the Ecological Forestry alternative. By failing to have a discussion on the record about these differences, neither the agency nor the public can participate in the informed decision-making process contemplated by NEPA.

The BLM did not determine on the record that the Ecological Forestry Alternative was unfeasible, ineffective, or inconsistent with other policy objectives. Nor is it similar enough to

---

[2] In briefing this issue, defendants claim that the Ecological Forestry alternative was not viable based on Plaintiffs' claims in recent unrelated litigation over another timber project in southern Oregon. Defendants claim that Plaintiffs represented in that litigation that BLM lacked authority under the 1995 Medford RMP to consider or implement an Ecological Forestry alternative. The Court does not find any evidence of this reasoning in the record, and therefore finds that it is outside the scope of this Court's review of BLM's decision and process in this case.

warrant the lack of discussion over the potential differences in fire resiliency and economic

viability. Therefore, consideration of an Ecological Forestry Alternative would have satisfied the

NEPA requirements to consider a reasonable range of alternatives.

### iii.    Practical considerations and conclusion

The Court is mindful of staying in its judicial "lane," and, in particular, not attempting to

be a forestry expert. However, the Court cannot help but be aware of the economic and

environmental destruction caused by recent severe wildfires in Southern Oregon. Everyone

agrees, immediate action is needed in the forests to reduce serious future risk to life, property,

and the forests themselves. The stakeholders in environmental litigation like the present case

have developed an unfortunate, but understandable, mistrust of each other over many years of

doing battle in court. This Court, having handled these cases for many years, believes that all

parties are acting in good faith. Although they have differing perspectives, they do have

common goals, including improving forest health and increasing fire resiliency, and they share a

sincere desire to manage forests in a sustainable and economically appropriate way for future

generations.

The government, environmental groups, and timber interests have collaborated on

successful forest management projects in recent years. It can be done. Each party has expertise

that should be at the table in discussing and planning these public projects. Such collaboration

has the promise to result in more transparency, improved outcomes, and fewer projects stuck in

time consuming litigation. As with most compromise in life, "the perfect should not get in the

way of the good." This project fell short of that collaborative spirit.

In this case, while there is no "minimum number" of alternatives the agency is required to

consider, when a distinct, feasible alternative is presented that matches the stated goals of the

project, considering such an alternative would certainly "foster informed decision-making and informed public participation," as contemplated by NEPA. Finally, such a robust discussion might have better avoided litigation, allowing this project to be implemented in a more timely manner. This case should be remanded back to the BLM for consideration of a reasonable range of alternatives. Viable alternatives that meet the stated goals of the project should be considered.

**(b) The BLM did not violate NEPA by failing to supplement NEPA in response to a newly established northern spotted owl nest site within the project area.**

An agency is not obligated to supplement an environmental document "every time new information comes to light" after the document's completion. *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 373 (1989). "To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Id.*

Although federal agencies are not required to supplement an environmental document every time new information comes to light, the NEPA implementing regulations require federal agencies to supplement an EIS in response to "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii). The regulations do not mention supplementation of an EA, but the Ninth Circuit has held that the standard for supplementing an EIS also applies to an EA. *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1152 (internal citations omitted), *overruled on other grounds by Lands Council v. McNair*, 537 F.3d 981, 997 (9th Cir. 2008).

In this case, after the Project decision issued, site 4625 and its northern spotted owl pair "moved to the northwest and successfully nested in a new alternate location (4625C) [moving from 4625B]." AR 00367 (Owl Movement Review 1). In response to the owl site movement, BLM modified the Project by dropping treatment in certain units to avoid a potential increase in

adverse effects to owls. Determination of NEPA Adequacy (DNA 5). USFWS[3] agreed with that

response and did not require re-initiation of consultation under the ESA. *Id.* As BLM explained:

> [T]he EA already disclosed that silviculture treatments for site 4625
> may have adverse effects on owls . . ... The site movement does not
> change the scale of effects on NSO from the project.... [USFWS]
> concluded that the project would reduce habitat for NSO site 4625
> and result in incidental take of owls . . ... [USFWS] agreed with the
> BLM's conclusion to drop or modify any treatments in nest patch
> areas and avoid re-initiation of consultation (USFWS December
> 2016).

DNA 12.

Here, BLM reasonably concluded that the movement of owl site 4625 followed by

BLM's dropping of treatments in certain units that implicated the relocated owl site did not

change the effects analysis for the Project, as a result of which NEPA supplementation was not

required. AR 367-70 (Owl Movement Review). BLM subsequently documented that conclusion

in a Determination of NEPA Adequacy, DNA 1-7, accompanied by a Supporting Information

Report. DNA 8-16. BLM's conclusion is supported by the record, and the Court finds that it was

not arbitrary or capricious.

### (c) The BLM did not violate NEPA by failing to take a "hard look" at effects of the project on the northern spotted owl based on potential overharvesting.

Plaintiffs claim that BLM failed to take a hard look at the effects of the project on the

spotted owl because BLM failed to disclose "foreseeable overharvesting" of nesting, roosting,

---

[3] Also informative is USFWS's incidental take statement for the Project. USFWS recognized in the BiOp that owl site 4625 would be adversely affected by the Project's proposed degree of habitat modification, even though no nesting/roosting/foraging habitat was being removed or downgraded at the owl site. AR 6485 (BiOp 41). See also AR 6486 (BiOp 42) (anticipating "harm to spotted owls" at site 4625). USFWS concluded that Project implementation was "likely to incidentally take" the owl pair at site 4625, along with an estimated 1.5 juveniles at the site. AR 6502 (BiOp 58). The owl site movement did not change the projected level of harm to owls. DNA 12 (Supporting Information Report 5). It makes no sense to require a NEPA supplement confirming the Project is still likely to take the owls at site 4625 – the effects simply are no different.

foraging and/or dispersal habitat. According to Plaintiffs, BLM has a pattern and practice of allowing overharvesting of owl habitat on vegetation management projects.

NEPA requires an agency to take a "hard look" at the environmental consequences of a proposed action. *Native Ecosys.* 697 F.3d at 1051. Particularly in the context of an EA, this does not mean an agency must "'compile an exhaustive examination of each and every tangential event that potentially could impact the environment.'" *Id.* at 1053 (quoting *Tri-Valley CARES v. U.S. Dep't of Energy*, 671 F.3d 1113, 1120 (9th Cir. 2012)). Rather, a NEPA "hard look" means the agency reasonably considered the foreseeable direct, indirect and cumulative effects of its proposed action. *Salazar*, 695 F.3d at 916-17. Regarding a challenge to an agency's substantive conclusions, the scope of judicial review is "quite narrow." *Akiak Native Cmty. v. U.S. Postal Serv.*, 213 F.3d 1140, 1146 (9th Cir. 2000). "We ordinarily 'must defer to the informed discretion of the responsible federal agencies.'" *Id.* (quoting *Marsh*, 490 U.S. at 377).

First, procedurally, this claim does not appear to be properly before the Court, based on the claims presented to IBLA for review. Plaintiffs did raise a NEPA claim alleging that BLM failed to address uncertainty about the project meeting canopy standards for owl habitat. AR 182-84. IBLA in turn found that Plaintiffs failed to explain "why BLM was required to discuss other timber sales in this particular EA, how BLM's actions in other projects equates to uncertainty or error in this project, and how this information amounts to 'uncertainty in the data.'" AR 33.

Second, substantively, the BLM did respond to comments raising the issue of unplanned overharvest, and it stated why the agency did not believe the past implementation errors would be a problem for this project. AR 2872-73. Namely, the agency indicated that metrics used on prior projects were not sufficient to ensure that owl habitat was being properly maintained. *Id.*

BLM then discussed using a different metric as a more quantitative approach to maintaining

habitat and indicated that meeting these retention requirements "are a project priority." *Id.* As to

concerns regarding implementation, BLM noted in the same response that

> the project silviculturalist and wildlife biologist worked together and
> reviewed the marking within each unit. They worked with and
> monitored the contract marking crews and during the process made
> several adjustments to the marking within the units. For some units
> this process occurred multiple times to ensure that basal area
> requirements were achieved.

*Id.* The Court finds no reason to second-guess these substantive conclusions by the agency, nor

to disbelieve BLM's stated intent to prioritize proper monitoring and implementation to avoid

overharvesting.

Finally, in the same way that the Court does not find BLM's arguments regarding

Plaintiffs' claims in other litigation regarding Ecological Forestry persuasive, the Court does not

find Plaintiff's arguments about BLM's actions on other projects indicative of their likely actions

on this project.[4] The government is granted the presumption that it will follow its own

recommendations and guidelines, and the record shows that it has anticipated the issue and found

improved ways to track compliance and avoid overharvesting. Thus, it is not clear that this issue

is properly before the Court, but even if it is, the BLM did not fail to take a hard look at effects

on the northern spotted owl habitat based on potential overharvesting.

## II. BLM fully complied with FLPMA.

Plaintiffs claim that BLM violated FLPMA by designating three active red tree vole sites

as non-high priority sites that would be treated as part of the project and by declining to protect

certain later-discovered vole sites.

---

[4] For this reason, and because there is no indication that the documents proposed were part of the agency record or
part of the record on administrative appeal to IBLA, Plaintiffs' motion for judicial notice (#52) is denied.

FLPMA requires BLM to manage lands in compliance with the governing Medford RMP. *See* 43 U.S.C. §§ 1712, 1732(a); *Klamath–Siskiyou Wildlands Center v. Medford Dist. of BLM*, 400 F. Supp. 2d 1234, 1241 (D. Or. 2005). FLPMA gives the BLM "a great deal of discretion in deciding how to achieve" such compliance. *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 66 (2004).

Here, the Lower Grave project is consistent with the 1995 Medford RMP. The Medford RMP requires that BLM undertake pre-disturbance surveys of voles prior to habitat-modifying activities. AR 9930-31, 26104. BLM conducted such surveys and detected 997 vole nests and 308 vole sites. AR 9929, 7378.

BLM also complied with the Medford RMP as amended by the standards and guidelines from the 2001 amendments to the NWFP. The 2001 amendments, "amend[ed]" the Medford RMP. AR 22921. Under the 2001 amendments, the red tree vole is classified as an uncommon (not rare) species assigned to Category C. AR 23033 (Standards and Guidelines 49) (listing the vole as a Category C species); *Klamath-Siskiyou Wildlands Center v. Boody*, 468 F.3d 549, 553 (9th Cir. 2006) (recognizing that the 2001 amendments assigned the vole to Category C). Under these guidelines, local land managers are expressly provided discretion to make "case-by-case" determinations that particular vole sites are "non-high priority" and therefore subject to land management actions. AR 22994 (Standards and Guidelines 10). These determinations require "local interagency concurrence" with FWS and the U.S. Forest Service. AR 22994.

Here, BLM followed the framework delineated in the 2001 NWFP amendments in reaching its site-by-site determination that the three vole sites are non-high priority. BLM applied specific scientific criteria in its analysis, and both FWS and the U.S. Forest Service concurred with BLM's proposal. AR 7377-408 (BLM analysis), AR 7262-63 (FWS

concurrence), AR 7409 (U.S. Forest Service concurrence).  BLM therefore complied with the

Medford RMP and FLPMA.

## RECOMMENDATION

For the reasons stated above, this case should be remanded to the BLM for consideration

of a reasonable range of alternatives. Viable alternatives that meet the stated goals of the project

should be considered.  Plaintiffs' other challenges to the project should be dismissed.

This Report and Recommendation will be referred to a district judge. Objections, if any,

are due no later than fourteen (14) days after the date this recommendation is filed.  If objections

are filed, any response is due within fourteen (14) days after the date the objections are filed.  *See*

Fed. R. Civ. P. 72, 6.  Parties are advised that the failure to file objections within the specified

time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153

(9th Cir. 1991).

DATED this _____ 20 _____ day of February, 2019.

_____

MARK D. CLARKE
United States Magistrate Judge