Michael E. Haglund, OSB No. 772030
e-mail: mhaglund@hk-law.com
Julie A. Weis, OSB No. 974320
e-mail: weis@hk-law.com
Christopher T. Griffith, OSB No. 154664
e-mail: cgriffith@hk-law.com
Haglund Kelley LLP
200 SW Market St., Suite 1777
Portland, Oregon 97201
Phone: (503) 225-0777
Facsimile: (503) 225-1257

Attorneys for Defendant-Intervenor
Murphy Company

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## MEDFORD DIVISION

| | |
|---|---|
| **KLAMATH SISKIYOU WILDLANDS CENTER**, an Oregon non-profit corporation; **OREGON WILD**, an Oregon non-profit corporation; and **CASCADIA WILDLANDS**, an Oregon non-profit corporation;<br><br>**Plaintiffs,**<br><br>v.<br><br>**BUREAU OF LAND MANAGEMENT**, an administrative agency of the United States Department of Interior, and **INTERIOR BOARD OF LAND APPEALS**,<br><br>**Defendants,**<br><br>**and**<br><br>**MURPHY COMPANY,**<br><br>**Defendant-Intervenor.** | Case No.:  1:17-cv-997-CL<br><br>**DEFENDANT-INTERVENOR'S OBJECTIONS TO THE MAGISTRATE'S FINDINGS AND RECOMMENDATION** |

**DEFENDANT-INTERVENOR'S OBJECTIONS TO THE MAGISTRATE'S FINDINGS AND RECOMMENDATION**

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................1

FACTUAL CORRECTIONS REGARDING THE COLLABORATIVELY-
DEVELOPED LOWER GRAVE PROJECT .....................................................4

LEGAL STANDARDS .......................................................................................7

I.      Review of Objections ...............................................................................7

II.     Review Under the Administrative Procedure Act ....................................8

        A.     Arbitrary and Capricious Standard of Review ..............................8

        B.     Deference to Agency Scientific Decision Making ........................9

ARGUMENT ......................................................................................................10

I.      The Magistrate Judge Erred in Recommending that BLM Failed as a
        Matter of Law to Consider a Reasonable Range of Alternatives for the
        Lower Grave Project Because the Project's No Action Alternative was
        Not a Reasonable Alternative ....................................................................10

II.     BLM Was Not Required to Give Detailed Consideration to KSWild's
        Preferred Ecological Forestry Alternative for 62 Acres of the Project
        Because Ecological Forest Was Not a Reasonable Alternative for
        Managing Those 62 Acres of Forest ..........................................................16

CONCLUSION....................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agdaagux Tribe of King Cove v. Jewell*,
128 F. Supp. 3d 1176 (D. Alaska 2015) ..............................................................11

*Cronin v. U.S. Dep't of Agric.*,
919 F.2d 439 (7th Cir. 1990) .............................................................................16

*Ctr. for Biological Diversity v. Salazar*,
695 F.3d 893 (9th Cir. 2012) ...............................................................12, 14, 15

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
349 F.3d 1157 (9th Cir. 2003) ....................................................................10, 23

*Deer Creek Valley Natural Resource Conservation Ass'n v. U.S. BLM*,
No. 1:12-cv-1596-CL, 2014 WL 458288 (Feb. 4, 2014 D. Or.).........................9-10

*Earth Island Inst. v. U.S. Forest Serv.*,
697 F.3d 1010 (9th Cir. 2012) .............................................................13, 16, 22

*Headwaters, Inc. v. BLM, Medford Distr.*,
914 F.2d 1174 (9th Cir. 1990) ......................................................................7, 16-17

*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008), *overruled in part on other grounds by Am.*
*Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d
1046 (9th Cir. 2009).......................................................................................8-9, 15, 16

*Marsh v. Oregon Natural Res. Council*,
490 U.S. 360 (1989)............................................................................................9

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
551 U.S. 644 (2007)............................................................................................8

*Native Ecosystems Council v. U.S. Forest Serv.*,
428 F.3d 1233 (9th Cir. 2005) ....................................................................*passim*

*Native Ecosystems Council v. Weldon*,
697 F.3d 1043 (9th Cir. 2012) .............................................................................9

*Natural Res. Defense Council, Inc. v. U.S. Forest Serv.*,
634 F. Supp. 2d 1045 (E.D. Cal. 2007)...............................................................11

*N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*,
    545 F.3d 1147 (9th Cir. 2008) ..................................................................12

*Nw. Envtl. Advocates v. NMFS*,
    460 F.3d 1125 (9th Cir. 2006) ...................................................................7

*Oregon Wild v. BLM*,
    No. 6:14-CV-0110-AA, 2015 WL 1190131 (D. Or. March 14, 2015)............................21, 22

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
    442 F.3d 741 (9th Cir. 2006) ...................................................................21

*Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*,
    435 U.S. 519 (1978)............................................................................15

**Statutes**

5 U.S.C. § 706(2)(A) ...........................................................................8

28 U.S.C.A. § 636(b)(1)........................................................................8

42 U.S.C. § 4321 et seq................................................................ *passim*

43 U.S.C. § 1701 et seq................................................................ 1-2, 4, 24

Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act of
    1937, 43 U.S.C. § 2601 ..................................................................7, 17, 20

**Other Authorities**

46 Fed. Reg. 18,026 (March 23, 1981) .........................................................2, 12

190 IBLA 295, 2017 WL 5653735 (July 3, 2017)..................................... 9, 12-13, 23

Rule 72 of the Federal Rules of Civil Procedure ..............................................1, 8

Local Rule 73-3................................................................................1

## INTRODUCTION

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure (FCRP), Local Rule 73-3, and the Magistrate Judge's Findings and Recommendation dated February 20, 2019 (F&R, ECF No. 57), defendant-intervenor Murphy Company hereby objects to Magistrate Judge Clarke's F&R regarding the Lower Grave Vegetation Management Project's compliance with the reasonable range of alternatives requirement of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq.   *See* F&R at 7-15.[1]   The F&R wrongfully recommends that the modest Lower Grave Vegetation Management Project (the Lower Grave Project, or the Project) be remanded to the Bureau of Land Management (BLM) for consideration of an additional alternative, namely plaintiffs' (collectively KSWild) preferred "ecological forestry" approach for 62 acres of the Project's 582 acres of commercial timber harvest.   F&R at 11-14. In making that recommendation, the F&R invites the Court to commit legal error.

On February 20, 2019, the Magistrate Judge issued the F&R that urged the reviewing Court to dismiss all of KSWild's challenges to the Lower Grave Project except the NEPA reasonable range of alternatives challenge.   The Magistrate Judge's F&R rightly concluded that KSWild failed to demonstrate that the Project was arbitrary and capricious under NEPA with respect to its analysis of a newly-established northern spotted owl nest site, F&R at 15-16, and alleged impacts of potential overharvesting.   F&R at 16-18.   The F&R also rightly concluded that the Project complies fully with the Federal Land Policy and Management Act (FLPMA), 43

---

[1] References in this brief to page numbers in filed documents are to those of the original document, not the ECF pagination displayed at the top of each page, which may differ from that of the original document.

**Page-1 DEFENDANT-INTERVENOR'S OBJECTIONS TO THE MAGISTRATE'S FINDINGS AND RECOMMENDATION**

U.S.C. § 1701 et seq., regarding red tree voles.   F&R at 18-20.   On those issues, the Court

should adopt the F&R and rule in favor of Murphy Company, BLM and the Interior Board of

Land Appeals (IBLA) (BLM and the IBLA are referred to collectively as Federal Defendants).

But as to NEPA's reasonable range of alternatives requirement, the Magistrate Judge

erred in two fundamental ways.   First, the F&R erroneously concludes that BLM failed as a

matter of law to consider a reasonable range of alternatives for the Project because one of the

two alternatives assessed, the mandatory no action alternative, was not a reasonable alternative.

F&R at 9-11.   That is a curious (and wrong) conclusion because by its very nature, a no action

alternative to a proposed land management action does not further the proposed action's purpose

and need – that is simply the way NEPA's mandatory no action alternative requirement works in

the context of proposed projects.   But that does not mean the no action alternative fails to further

NEPA's "hard look" requirement.   Rather, it has always been the case that NEPA's mandatory

no action alternative furthers NEPA's action-forcing goals by "provid[ing] a benchmark,

enabling decisionmakers to compare the magnitude of environmental effects of the action"

versus non-action.   46 Fed. Reg. 18,026, 18,027 (March 23, 1981) (so stating in the Council on

Environmental Quality's seminal NEPA guidance, "Forty Most Asked Questions").   It thus is no

surprise that the Ninth Circuit has specifically held that NEPA allows an environmental

assessment (EA) to have only two alternatives, a no action alternative (i.e., maintain the status

quo) and one preferred alternative (i.e., implement the proposed project).   Because the

Magistrate Judge erred on this point, adopting the F&R's recommendation would be reversible

error.

Page-2 **DEFENDANT-INTERVENOR'S OBJECTIONS
TO THE MAGISTRATE'S FINDINGS AND
RECOMMENDATION**

Second, building on its first error, the F&R wrongly concludes that KSWild's preferred ecological forestry alternative for the Project's 62 acres of regeneration harvest (out of the Project's 582 acres of commercial timber harvest) was a reasonable alternative that should have been assessed in detail in the EA.   F&R at 11-14.   In making that recommendation, the Magistrate Judge afforded BLM no deference on a matter involving substantial agency technical expertise, namely BLM's scientific determination that the governing 1995 Resource Management Plan (RMP) called for regeneration harvest on the 62 acres at issue.   Instead of affording BLM appropriate deference on this silvicultural matter, the F&R instead substituted KSWild's land management opinion for that of the agency tasked by Congress with managing the forest lands at issue.   The F&R did so despite clear evidence in the record that KSWild's opposition to the 62 acres of regeneration harvest stems from its philosophical opposition to the RMP's inclusion of regeneration harvest as a land management tool.   *See, e.g.*, Pls.' Summ. J. Br. (ECF No. 31) at 24 (advocating instead for a "mother nature" approach to the 62 acres in dispute, which would "'mimic natural ecological processes'" and retain more than twice as many trees) (quoting RMP direction applicable to a wholly different area of forest).   Thus, in the context of a Project that will have no significant effects on the environment (no one disputes this), the F&R would allow KSWild to succeed on a substantive challenge to the RMP's land management direction under the guise of a NEPA procedural claim.   Respectfully, the Court should afford BLM the deference it is due when choosing which alternatives to assess in the Lower Grave EA.   Having done so, the Court should decline to order BLM to assess an alternative that is both an ill fit with the Project's purpose and need and inconsistent with the land management direction embodied in the RMP.

Page-3 **DEFENDANT-INTERVENOR'S OBJECTIONS TO THE MAGISTRATE'S FINDINGS AND RECOMMENDATION**

As discussed below, the Court should reject the F&R regarding the Project's compliance with NEPA's reasonable range of alternatives requirement. Based on its de novo review, the Court should uphold the Lower Grave Project in its entirety under NEPA and FLPMA and grant summary judgment in favor of Murphy Company and Federal Defendants.

## FACTUAL CORRECTIONS REGARDING THE COLLABORATIVELY-DEVELOPED LOWER GRAVE PROJECT

The F&R accurately describes the modest Lower Grave Project at pages 2-3. But in a separate section, the F&R in dictum inexplicably criticizes the Project for an alleged lack of compromise in response to public comment. The F&R is not accurate in that regard.

As initially proposed, the Lower Grave Project would have treated 1,922 acres of forest. Administrative Record (AR) 15130, 15132. *See generally* AR 15129-34 (letter to interested parties inviting participation in the NEPA process for the Lower Grave Project). Of that 1,922 acres, BLM proposed commercial harvest on 1,660 acres, with the remaining 262 acres undergoing hazardous fuels reduction treatment only. AR 15132. Regarding regeneration harvest, which is a silvicultural prescription provided for in the governing 1995 RMP to which KSWild is philosophically opposed, the Project initially envisioned 120 acres of forest undergoing regeneration harvest. AR 15132.

But as the Project developed through the NEPA process, it evolved significantly. The Project footprint shrank by more than 50%, with the Decision Record approving active land management on only 960 acres of forest.[2] AR 2744. *See also* AR 9831. Further, in contrast

---

[2] The EA assessed the impacts of proposed actions on 1010 acres, but the Project decision authorized treatment on only 960 acres. Fifty acres were dropped from the already-modest Project "to reduce effects to northern spotted owls and buffer botany sites." AR 2743.

Page-4 **DEFENDANT-INTERVENOR'S OBJECTIONS TO THE MAGISTRATE'S FINDINGS AND RECOMMENDATION**

with the initial proposal to employ commercial harvest on 1,660 acres, in its final form the

Project only allows for commercial harvest on 582 acres, a decrease of approximately 65%.   AR

2743.   *See also* AR 2744 (showing that the remaining 378 acres will only be treated to reduce

hazardous fuel levels).   Regarding regeneration harvest, BLM dropped almost half of the

proposed acres, leaving only 62 acres of regeneration harvest treatment in the Project.   AR

2744.

Despite these changes, KSWild remained unsatisfied, apparently because of its desire to

see the Project rid of *all* regeneration harvest acres.   *See, e.g.*, Pls.' Response/Reply Summ. J.

Mem. (ECF No. 36) at 5 (describing the regeneration harvest acres as "the focal point of

plaintiffs' concerns").   In briefing before the Magistrate Judge, KSWild went so far as to

inaccurately describe regeneration harvest as "clearcutting," which it is not.   Pls.' Summ. J. Br.

(ECF No. 31) at 19 n.3.   In fact, to help stakeholders understand the nature of regeneration

harvest, BLM had shared photographs of regeneration harvest units with the public during the

NEPA scoping process:



AR 15035.   Plainly, "[r]egeneration harvesting on federally managed lands does not resemble or

function as industrial clearcut parcels."   AR 2923.   Further, whereas the governing RMP

required the retention of at least six to eight large conifers per acres in the regeneration harvest units, BLM informed the public during the NEPA process that it might require the retention of additional conifers, AR 15035, which the agency ultimately did.   AR 7184 (requiring the retention of "8 to 12 trees per acre" in the Project's regeneration harvest units).   *See also* AR 9877 (explaining in the EA that the number of large green trees retained per acre would be "based upon varying site conditions").   The F&R overlooked this fact.   F&R at 12 (stating that the Project's regeneration harvest "would leave only 6-8 trees per acre").

Another KSWild mischaracterization of the Project that is reflected in the F&R and warrants correction is the notion that the Lower Grave Project's 62 acres of regeneration harvest will "increase fire hazard."   F&R at 12.   In reality, regeneration harvest resets the forest stand's development stage to an "early-successional condition" which, as the stand develops, will have varying degrees of resiliency to fire, sometimes higher and sometimes lower:

> [The Project's regeneration harvest] would cause a discontinuous pattern across the forest canopy and could disrupt fire behavior by creating gaps in the forest canopy.   There would be a short-term increase in surface fuels and fire behavior until implementation of activity slash treatments.   These units would have a reduction in potential fire behavior following reforestation until the new stand becomes well established.   As the stand develops it would represent a shrub fuel model with an increased fire behavior potential as vegetation occupies the site. In the long-term, as these forests stands mature (TU or TL fuel models), fire behavior would decrease and fuel loading and ladder fuels would be reduced through Silviculture practices, and natural competition for space, moisture, light and nutrients.

AR 9888.   Forest ecosystems are not static, and it simply is incorrect to say that regeneration harvest treatments "increase fire hazard."

The Court should recognize that BLM did not stake out a position and refuse to listen to stakeholder input when developing the Project.   Rather, as a result of the collaborative NEPA

Page-6 **DEFENDANT-INTERVENOR'S OBJECTIONS TO THE MAGISTRATE'S FINDINGS AND RECOMMENDATION**

process, the Lower Grave Project became significantly smaller with a lighter touch on the land

*before* the Decision Record issued.    BLM drastically shrank the Project's commercial timber

harvest component despite the Project Planning Area being comprised of O&C Act lands[3]  where

sustained yield timber production is the recognized dominant use.    AR 9832-33.    BLM also did

so despite the vast majority of the commercial timber harvest acres being Matrix lands, which is

the land use allocation under the Northwest Forest Plan that allows generally for timber

harvesting.    AR 2740-41; AR 9838.    And BLM did so even though the Matrix lands are within

the RMP's General Forest Management Area land allocation, where "intensive timber

management [i]s a primary objective."    AR 10037.    The significant evolution of the Project in

response to stakeholder input is relevant to the Court's de novo NEPA evaluation and counsels in

favor of upholding the Project.    *See Nw. Envtl. Advocates v. NMFS*, 460 F.3d 1125, 1138 (9th

Cir. 2006) (stating approvingly in the context of NEPA that an agency "remained open to input

from stakeholders and conducted new analyses to address their concerns").

## LEGAL STANDARDS

### I.    Review of Objections.

When a party objects to any part of a magistrate judge's findings and recommendation,

the district court's charge is to "make a de novo determination of those portions of the report or

---

[3]  The O&C Act is the Oregon and California Railroad and Coos Bay Wagon Road Grant Lands
Act of 1937, 43 U.S.C. § 2601.   It mandates that O&C Act lands "shall be managed . . . for
permanent forest production, and the timber thereon shall be sold, cut and removed in conformity
with the principal [sic] of sustained yield . . . ."   *Id.*   Consistent with the plain language of the
statute, the Ninth Circuit has held that the O&C Act is a "timber production . . . dominant use"
statute.   *Headwaters, Inc. v. BLM, Medford Distr.*, 914 F.2d 1174, 1184 (9th Cir. 1990).

Page-7 **DEFENDANT-INTERVENOR'S OBJECTIONS
TO THE MAGISTRATE'S FINDINGS AND
RECOMMENDATION**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201

specified proposed findings or recommendations to which objection is made."   28 U.S.C.A. §

636(b)(1).   The district court "may accept, reject, or modify, in whole or in part, the findings or

recommendations made by the magistrate judge."   *Id.*   The district court also may "recommit

the matter to the magistrate judge with instructions."   *Id.   See also* FRCP 72(b)(3) (setting forth

the de novo standard of review and the district court's suite of potential actions on timely

objections).   In this case, the reviewing Court should reject the Magistrate Judge's NEPA

reasonable range of alternatives recommendation and instead uphold the Lower Grave Project in

its entirety.

## II.    Review Under the Administrative Procedure Act.

### A.    Arbitrary and Capricious Standard of Review.

NEPA challenges to agency land management decisions are reviewed under the

Administrative Procedure Act's (APA) arbitrary and capricious standard of review.    5 U.S.C. §

706(2)(A) (providing that an agency decision may be set aside only if it is "arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law").   The APA's arbitrary and

capricious standard is a narrow one that precludes a reviewing court from substituting its own

judgment (or that of a plaintiff) for that of the agency.    *Nat'l Ass'n of Home Builders v.

Defenders of Wildlife*, 551 U.S. 644, 658 (2007); *Lands Council v. McNair*, 537 F.3d 981, 987

(9th Cir. 2008), *overruled in part on other grounds by Am. Trucking Ass'ns, Inc. v. City of Los

Angeles*, 559 F.3d 1046 (9th Cir. 2009).   Under this standard, an agency's decision should be

upheld unless the agency "relied on factors Congress did not intend it to consider, 'entirely failed

to consider an important aspect of the problem,' . . . offered an explanation 'that runs counter to

the evidence before the agency, or is so implausible that it could not be ascribed to a difference

Page-8 **DEFENDANT-INTERVENOR'S OBJECTIONS
TO THE MAGISTRATE'S FINDINGS AND
RECOMMENDATION**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201

in view or the product of agency expertise.'"   *McNair*, 537 F.3d at 987 (citation omitted).

KSWild appealed the Project to the Interior Board of Land Appeals (IBLA), which

upheld the BLM decision (after concluding that only one of the three plaintiffs in this case,

KSWild, had standing to appeal the Project).   *See generally* 190 IBLA 295, 2017 WL 5653735

(July 3, 2017); AR 20-39.[4]   An IBLA decision should be upheld absent arbitrary and capricious

decision making.

> **B.**    <u>**Deference to Agency Scientific Decision Making.**</u>

Federal agencies are owed substantial deference by bodies reviewing agency action,

particularly agency action involving scientific matters.   *McNair*, 537 F.3d at 988.   *See also*

*Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 376-77 (1989) (deference to an agency's

decision is particularly appropriate where questions of scientific methodology or technical

expertise are involved).   Review should be at its *most* deferential where an agency is addressing

difficult issues within its area of special expertise.   *McNair*, 537 F.3d at 993.

Two additional aspects of deference to agency decision making should inform the Court's

NEPA reasonable range of alternatives analysis.   First, an "agency's interpretation and

application of its own management direction" in the governing RMP is entitled to "'substantial

deference.'"   *Deer Creek Valley Natural Resource Conservation Ass'n v. U.S. BLM*, No. 1:12-

cv-1596-CL, 2014 WL 458288 (Feb. 4, 2014 D. Or.) (unpublished opinion) (quoting *Native*

*Ecosystems Council v. Weldon*, 697 F.3d 1043, 1055-56 (9th Cir. 2012)).   Second, "an agency

has discretion to determine which alternatives to analyze in-depth."   *Deer Creek*, 2014 WL

---

[4]  The IBLA decision in the AR is missing a few pages, so this brief instead cites to the
published version of the decision.

Page-9 **DEFENDANT-INTERVENOR'S OBJECTIONS
TO THE MAGISTRATE'S FINDINGS AND
RECOMMENDATION**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201

458288, at *8 (citing *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435

U.S. 519, 551 (1978)).    *See also Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d

1157, 1169 n.9 (9th Cir. 2003) ("[W]e defer to the agency to decide in the first instance what

range of alternatives to consider and respond to in light of the differing scientific opinions.").

Properly applied, these legal standards compel rejection of the F&R's reasonable range of

alternatives recommendation.

## ARGUMENT

**I.    The Magistrate Judge Erred in Recommending that BLM Failed as a Matter of Law to Consider a Reasonable Range of Alternatives for the Lower Grave Project Because the Project's No Action Alternative was Not a Reasonable Alternative.**

The Magistrate Judge erred by concluding that BLM failed as a matter of law to consider

a reasonable range of alternatives for the Project by considering only the mandatory no action

alternative and the proposed action alternative.[5]    F&R at 9-11.    The Magistrate Judge's decision

was based on an unfounded concern that one of the two alternatives assessed in detail, the no

action alternative, was not a reasonable alternative because it did not satisfy the proposed

action's purpose and need.    F&R at 9.    This conclusion, which misapprehends the role of the no

action alternative in the NEPA analysis and runs afoul of governing case law, tainted the entirety

of the F&R's reasonable range of alternatives analysis.    Indeed, as Murphy Company pointed

---

[5]    In addition to giving detailed consideration to the no action alternative and the proposed
action alternative, BLM also considered but did not give detailed consideration to two additional
alternatives, one involving the decommissioning of roads and reducing the permanent road
network and another involving ecosystem services.    AR 9836.    Alternatives "rejected without
detailed consideration" are still alternatives for purposes of a reasonable range of alternatives
analysis.    *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1245 (9th Cir. 2005).
Thus, the Lower Grave Project involved the consideration of at least four alternatives, with
detailed consideration given to two alternatives, one of which was the no action alternative.

Page-10    **DEFENDANT-INTERVENOR'S OBJECTIONS
TO THE MAGISTRATE'S FINDINGS AND
RECOMMENDATION**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201

out in briefing before the Magistrate Judge, even KSWild rightly abandoned this meritless

argument in its summary judgment reply brief.    *See* Murphy Company Summ. J. Reply Br.

(ECF No. 41) at 4 ("On reply, KSWild abandons its first argument [that BLM failed to consider

a reasonable range of alternatives as a matter of law by giving detailed consideration to only two

alternatives], which was meritless.").

There is no requirement (or expectation) that a no action alternative "must meet the need

and purpose of a proposed project.    In fact, the no action alternative generally does not satisfy

the proposed action's purpose and need; its inclusion in the [EA] is required by NEPA as a basis

for comparison."    *Agdaagux Tribe of King Cove v. Jewell*, 128 F. Supp. 3d 1176, 1194 (D.

Alaska 2015) (citation and internal quotation marks omitted).    *See also Natural Res. Defense

Council, Inc. v. U.S. Forest Serv.*, 634 F. Supp. 2d 1045, 1059 (E.D. Cal. 2007) ("Aside from a

no-action alternative, an alternative is 'reasonable' if it meets the purpose and need for the

proposed action.").

By its inherent nature, a no action alternative to a proposed land management action does

not further the proposed action's purpose and need – there is nothing remarkable about that fact.

*Cf.* F&R at 9 (criticizing the Lower Grave Project's no action alternative for failing to further

"the stated purposes and goals of the" Project).    Engaging in active land management versus

foregoing action and instead maintaining the status quo are intrinsically different courses of

conduct.    But that does not mean the no action alternative to a proposed action fails to inform

the decision maker or the public regarding the environmental consequences of such courses of

conduct.    Rather, NEPA's mandatory no action alternative furthers NEPA's environmental

hard look requirement by "provid[ing] a benchmark, enabling decisionmakers to compare the

Page-11 **DEFENDANT-INTERVENOR'S OBJECTIONS
TO THE MAGISTRATE'S FINDINGS AND
RECOMMENDATION**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201

magnitude of environmental effects of the action" versus non-action.   46 Fed. Reg. at 18,027

(Council on Environmental Quality's answer to question 3 in its "Forty Most Asked Questions"

document).   *See also id.* (explaining that even where an "agency is under a court order or

legislative command to act," NEPA still requires the agency to evaluate the environmental

consequences of not acting to help fully inform interested stakeholders).   This has always been

the underlying framework for NEPA's alternatives analysis.   It thus is unsurprising that

governing case law allows an EA for a project to have only two alternatives, a no action

alternative (i.e., do not implement the Lower Grave Project) and one preferred alternative (i.e.,

implement the Lower Grave Project).

Although NEPA's alternatives analysis requirement applies whether an agency prepares

an environmental impact statement [EIS] or an EA, the obligation to consider alternatives in an

EA "'is a lesser one than under an EIS.'"   *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893,

915 (9th Cir. 2012) (quoting *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233,

1246 (9th Cir. 2005)).   Unlike an EIS, where the agency must "[r]igorously explore and

objectively evaluate all reasonable alternatives," NEPA requires only "a brief discussion of

reasonable alternatives" in an EA.   *Id.* (quoting *N. Idaho Cmty. Action Network v. U.S. Dep't of

Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008) (further citations and quotation marks omitted)).

The Ninth Circuit has specifically held that NEPA allows an EA to have only two alternatives, a

no action alternative and one preferred action alternative.   *Native Ecosystems Council*, 428 F.3d

at 1246 (concluding that NEPA "does not impose a numerical floor on alternatives to be

considered").   In contrast with the F&R, the IBLA decision was consistent with this precedent.

190 IBLA at 306, 2017 WL 5653735, at *7 (properly observing, when rejecting KSWild's

Page-12 **DEFENDANT-INTERVENOR'S OBJECTIONS
TO THE MAGISTRATE'S FINDINGS AND
RECOMMENDATION**

reasonable range of alternatives argument, that "NEPA does not require that an agency consider a minimum number of alternatives, and it generally suffices for an agency to consider a no action and proposed action alternative in an EA, particularly if the proposed action will achieve environmental benefits").

The F&R acknowledged that *Native Ecosystems Council* is a "seminal case" on this issue. F&R at 9.   In *Native Ecosystems Council*, where the Ninth Circuit upheld an EA that fully considered only one action alternative and a no action alternative, a plain reading of NEPA's implementing regulations compelled the court to conclude there is no "numerical requirement as the bellwether of reasonableness."   428 F.3d at 1246.   That an EA may lawfully consider only two alternatives was further cemented in *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010 (9th Cir. 2012).   There, the court observed that since the *Native Ecosystems Council* decision, it was unaware of any "Ninth Circuit case where an EA was found arbitrary and capricious [simply because] it considered" only a no action and one action alternative.   *Earth Island*, 697 F.3d at 1022.   Yet that is the outcome the Magistrate Judge has recommended to this Court.

There is no support for the Magistrate Judge's foundational assumption that where an EA gives detailed consideration to only two alternatives, the no action alternative must be a reasonable alternative that would further the project's purpose and need.   Looking for support, the F&R first discusses whether the no action alternative in *Native Ecosystems Council* was reasonable, concluding that the court "did not specifically address" that issue.   F&R at 9. *Native Ecosystems Council* did not address that issue because it was not relevant – again, a no action alternative to a proposed land management project is neither required nor expected to be reasonable.   If *Native Ecosystems Council* had addressed the issue, it would have concluded that

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201

the no action alternative did not further the project's purpose and need.   This is because *Native Ecosystems Council* involved an active land management project designed to reduce the risk of catastrophic wildfire through "thinning, prescribed burning and weed management on approximately 1,500 acres" of forest, 428 F.3d at 1235, whereas the no action alternative would have left those 1,500 acres of forest untreated.   But again, the reasonableness of the no action alternative was irrelevant to the conclusion in *Native Ecosystems Council*, namely that a challenge to an EA for "having only two final alternatives – no action and a preferred alternative," was "doom[ed]."   *Id.* at 1246.

The F&R next looks for support in another NEPA case involving two alternatives, *Center for Biological Diversity v. Salazar*, 695 F.3d 893 (9th Cir. 2012).   *Salazar* dealt with the proposed issuance of incidental take regulations under the Marine Mammal Protection Act for oil and gas exploration in certain Alaskan waters.   *Salazar* itself did not discuss whether the no action alternative was reasonable – why would it – but rather evaluated the agency's characterization of the effects of no action.   *Id.* at 915-16.   According to the F&R, the *Salazar* no action alternative was a reasonable alternative, which (the F&R implied) somehow supports the notion that a no action alternative must be a reasonable alternative where an EA analyzes only two alternatives in detail.   F&R at 10.   Actually, the two alternatives assessed in *Salazar* were polar opposites – the promulgation of incidental take regulations versus no promulgation of regulations – such that the no action alternative arguably was not a reasonable alternative.   But the underlying oil and gas exploration activities for which the incidental take regulations were sought could proceed with or without the rules, which might be why the F&R described the no action alternative as "viable and reasonable."   F&R at 10.   Regardless, whether the no action

Page-14 **DEFENDANT-INTERVENOR'S OBJECTIONS TO THE MAGISTRATE'S FINDINGS AND RECOMMENDATION**

alternative in *Salazar* was reasonable does nothing to inform the reasonable range of alternatives

inquiry for the Lower Grave Project.

It is black letter law in the Ninth Circuit that an EA's reasonable range of alternatives

may be comprised of only two alternatives, a no action alternative and one preferred action

alternative.  *Native Ecosystems Council*, 428 F.3d at 1246.   It also is well established that courts

cannot engraft "a requirement not found in . . . statute or regulation" onto NEPA's procedural

requirements.  *McNair*, 537 F.3d at 991.   In fact, the Supreme Court has long cautioned courts

"against engrafting their own notions of proper procedures upon agencies" like BLM.  *Vermont*

*Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 525 (1978).   The

F&R runs afoul of these teachings by attempting to import a new requirement into the NEPA

alternatives analysis inquiry, namely a requirement that where an EA considers in detail only two

alternatives, the no action alternative must further the project's purpose and need.   Given that

the no action alternative to a proposed land management project will never further the project's

purpose and need, the Magistrate Judge's recommendation effectively would impose a numerical

floor on alternatives to be considered – at least two reasonable action alternatives plus the no

action alternative – contrary to Ninth Circuit precedent.   *See, e.g.*, *Native Ecosystems Council*,

428 F.3d at 1246.   The Court thus should reject the Magistrate Judge's erroneous conclusion

that BLM failed as a matter of law to consider a reasonable range of alternatives for the Project

because the no action alternative was not a reasonable alternative.

///

///

///

Page-15 **DEFENDANT-INTERVENOR'S OBJECTIONS TO THE MAGISTRATE'S FINDINGS AND RECOMMENDATION**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201

## II.    BLM Was Not Required to Give Detailed Consideration to KSWild's Preferred Ecological Forestry Alternative for 62 Acres of the Project Because Ecological Forestry Was Not a Reasonable Alternative for Managing Those 62 Acres of Forest.

After erroneously concluding that BLM should have considered an additional alternative, the Magistrate Judge compounded the error by characterizing as a reasonable alternative KSWild's preferred "ecological forestry" approach for the 62 acres of forest that BLM had determined were best suited to the regeneration harvest silvicultural prescription.  F&R at 11-14. In recommending that BLM should have given detailed consideration to KSWild's preferred alternative for those 62 acres of the 960-acre Project, the F&R effectively substituted KSWild's opinion for that of the expert land management agency entrusted by Congress to manage the public lands at issue.   The F&R did so despite Ninth Circuit teachings that judicial review of agency action should be at its *most* deferential where an agency is addressing difficult technical issues within its area of special expertise.   *See, e.g.*, *McNair*, 537 F.3d at 993.   Even a cursory review of the Lower Grave Project's administrative record reveals the highly technical nature of forest management.   *See Cronin v. U.S. Dep't of Agric.*, 919 F.2d 439, 444 (7th Cir. 1990) ("Trees may seem far removed from the arcana of administrative determination, but one has only to glance at the documents submitted in this case to realize that 'silviculture' is in fact a technical field, and not just one with a dry and forbidding vocabulary.").

An agency need not consider "alternatives which are . . . inconsistent with the basic policy objectives for the management of the area."   *Headwaters, Inc. v. BLM, Medford Dist.*, 914 F.2d 1174, 1180 (9th Cir. 1990).   An agency also need not consider an alternative where it determines, in its expertise, that its proposed action would best accomplish the project's goal. *Earth Island*, 697 F.3d at 1022 (upholding EA that considered only two alternatives where the

agency's one action alternative "better accomplished [the project's] goal . . . than Plaintiffs'
proposed alternative").   *See also Native Ecosystems Council*, 428 F.3d at 1247 (a proposed
alternative "that do[es] not advance the purpose of . . . [a project] will not be considered
reasonable or appropriate").   And in declining to give detailed consideration to a proposed
alternative, an agency need only provide "an appropriate explanation" to comply with NEPA.
*Id.* at 1246.

On the facts of this case, the Court should defer to BLM's choice of which alternatives to
analyze in the Lower Grave EA and uphold the agency's alternatives analysis as reasonable
under NEPA.   As discussed below, ecological forestry was inconsistent with the basic policy
objectives in the governing RMP for management of the 62 acres of forest at issue.   BLM also
determined that complying with the RMP's direction for regeneration harvest on the 62 acres
would best further the Project's stated purposes of "improv[ing] forest health and vigor" and
"providing a sustainable supply of timber" from lands where timber production is the primary
land management emphasis.   AR 9833.   *See also* AR 23484 (stating that on General Forest
Management Area lands, "timber harvest is a primary objective"); *Headwaters*, 914 F.2d at 1184
(timber production is the "dominant use" on O&C Act lands).

KSWild's administrative protest made clear that KSWild was demanding the elimination
of the 62 acres of regeneration harvest.   AR 2537.   But the governing RMP calls for
regeneration harvest under the conditions that exist on the 62 acres at issue.   AR 24815
(explaining that a silvicultural indicator for regeneration harvest under the RMP is that a forest
stand has reached its "peak of average yearly growth in volume," a metric called culmination of
mean annual increment); AR 10040 (confirming that the regeneration harvest forest stands "have

Page-17 **DEFENDANT-INTERVENOR'S OBJECTIONS
TO THE MAGISTRATE'S FINDINGS AND
RECOMMENDATION**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201

likely met or exceeded the age, 100 years, at which culmination of mean annual increment most likely occurs in Southwestern Oregon . . . . the 10 year age class for these three stands are 100, 120, and 160."). KSWild opposes the regeneration harvest land management direction in the RMP. AR 2537 (stating in its protest that "the scientific principles of Ecological Forestry . . . call into question the EA scientific basis for regen harvest"). But a procedural NEPA challenge is not a proper vehicle for challenging land management direction in the RMP. KSWild – and now the F&R – essentially urges that BLM be ordered to disregard the land management direction in the 1995 RMP and instead analyze the effects of applying ecological forestry on the 62 acres at issue, despite the fact that ecological forestry is nowhere mentioned in the governing RMP. KSWild's ecological forestry alternative thus conflicts with the governing RMP's regeneration harvest policy objectives for management of the 62 acres of forest at issue. BLM explained this in its response to comments. AR 10046 ("The BLM is directed by the RMP to propose RH [regeneration harvest] in stands over 100 years old."). Put simply, it is not reasonable to order BLM to disregard the land management direction in the 1995 RMP.

KSWild's preferred ecological forestry alternative was based on KSWild's belief – contrary to the determination of BLM scientists – that Project area lands should be managed according to Southern General Forest Management Area direction instead of Northern General Forest Management Area direction. Pls.' Summ. J. Br. (ECF No. 31) at 24. KSWild admitted that the difference between the two types of management is "significant." *Id.* Indeed, the Southern General Forest Management Area direction is akin to a passive "mother nature" approach whereby management aims to "mimic natural ecological processes." AR 24903. But the Matrix lands undergoing regeneration harvest are within the Northern General Forest

Management Area where the RMP requires the retention of "at least 6 to 8 green conifer trees per acre in regeneration harvest units," AR 24751, bettered for this Project to 8-12 trees per acre, AR 07184, not the Southern General Forest Management Area where BLM must "retain at least 16-25 large, green conifer tress per acre." AR 24751. The EA confirmed that the Matrix lands at issue are in the Northern General Forest Management Area. AR 10037. That reality underscores the unreasonableness of KSWild's demand for an ecological forestry alternative.[6]

Regeneration harvest on the 62 acres of forest also dovetails with the Project's stated purpose of "improv[ing] forest health and vigor." AR 9833. Consistent with the Project's purpose, BLM described the identified need this way:

> Active management is needed because the elements of forest and stand health are not currently being met. Stand conditions indicate the need for reducing stand density, retaining older trees with large crowns, favoring drought tolerant species, providing structural complexity (un-thinned patches and small openings), and increasing average stand diameter. These characteristics would increase stand resilience to environmental disturbances. This assessment of forest health is based on formal stand exams and field reviews.

> Forest management is appropriate . . . to reduce stand density for residual tree vigor and development and provide an active management entry that is economically feasible (RMP pp. 179-180; RMP/EIS pp. 2-62).

AR 9833. *See also* AR 2741 (explaining that management direction in the RMP requires BLM to control or reduce stand density and maintain stand and residual tree vigor).

---

[6]  BLM pointed out in response to comments that it incorporated some of the principles of ecological forestry into the Project, like aiming to "conserve and improve the survivability of legacy trees," increasing "resilience of forest stands and the landscape," and fostering tree species diversity. AR 2874. Those similarities did not satisfy KSWild, however, given KSWild's ultimate goal of forcing BLM to manage the Northern General Forest Management Area regeneration harvest acres according to a passive "mother nature" approach that would have retained at least twice as many trees, and that was inconsistent with the governing land management direction for the acres at issue.

Page-19 **DEFENDANT-INTERVENOR'S OBJECTIONS TO THE MAGISTRATE'S FINDINGS AND RECOMMENDATION**

The average stand age for the areas undergoing regeneration harvest is 130 years.    AR

09869.    *See also* AR 10035 (age of the regeneration harvest stands ranges from "100-160 years

old").    That age is biologically significant because it surpasses the age where "the rate at which

the trees are growing begins to decline."    AR 10040.    In the Project area, 100 years is

approximately the stand age at which forest stands reach their culmination of mean annual

increment.    AR 9867-68.    The RMP directs that for lands in General Forest Management Areas,

which are "managed on a regeneration harvest cycle of 70-110 years," AR 24817, forest stands

at or beyond the culmination of mean annual increment are declining in vigor and ready for

regeneration harvest.    AR 9868.    Thus, consistent with the RMP, and to further the purpose and

need of the Project, BLM applied the regeneration harvest silvicultural prescription to the 62

acres in contention.

KSWild's fixation on excluding regeneration harvest and instead "retain[ing] more of the

older" and larger trees, F&R at 12, also detracted from the Project's purpose and need of

providing a sustainable supply of timber from lands having a timber production management

emphasis.    AR 9833 (discussing the sustained yield timber production mandate of the O&C Act,

and the similar direction in the RMP, for lands within the Planning Area).    *See also* AR 23507

(the General Forest Management Area lands at issue "are available for intensive timber

management").    The response to comments explained that a BLM obligation for lands in the

Project area is "to produce a sustainable supply of timber . . . to provide jobs and contribute to

community stability."    AR 2759-60.    Regeneration harvest is consistent with BLM's governing

land management direction for Matrix/General Forest Management Area/O&C Act lands in the

Project area and is a Project component that will help BLM meet the Project's purpose and need

of "providing a sustainable supply of timber."   AR 9833.   *See also* AR 2759-60 (discussing

same in response to comments); AR 9842 (EA 18) (explaining that one of the objectives of

regeneration harvest is to "provide a sustainable supply of timber and other forest products that

will provide jobs and contribute to community stability").

   In briefing before the Magistrate Judge, KSWild did not hide the fact that its

philosophical opposition to regeneration harvest led it to favor an ecological forestry approach

that would have retained more older trees on the 62 acres at issue.   But KSWild did hide the fact

that its fondness for ecological forestry under the governing RMP is new-found.   As Federal

Defendants pointed out during summary judgment briefing, KSWild asserted in recent litigation

that ecological forestry is not authorized under the 1995 RMP.   Fed'l Defs.' Summ. J. Mem.,

Exhibit A (ECF No. 34-1) at 9 (allegations of KSWild, contrary to its position in this case, that

BLM "erred by not delaying implementation of ecological forestry for project level timber sales

until after appropriate programmatic NEPA analysis and the issuance of an RMP that authorizes

ecological forestry").   Inexplicably, the Magistrate Judge refused to consider this information,

which is a matter of public record and appropriate for judicial notice.   F&R at 13 n.2 ("The

Court does not find any evidence of this reasoning in the record, and therefore finds that it is

outside the scope of this Court's review of BLM's decision and process in this case.").   This

Court certainly may, and should, "take judicial notice of court filings and other matters of public

record" that inform the issue on review.   *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d

741, 746 n.6 (9th Cir. 2006).

   The Magistrate Judge also characterized KSWild's ecological forestry alternative as a

reasonable alternative for consideration in the EA despite a holding to the contrary in *Oregon*

Page-21 **DEFENDANT-INTERVENOR'S OBJECTIONS
TO THE MAGISTRATE'S FINDINGS AND
RECOMMENDATION**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201

*Wild v. BLM,* No. 6:14-CV-0110-AA, 2015 WL 1190131 (D. Or. March 14, 2015), a case

brought by two of the plaintiffs in this case.   In *Oregon Wild*, which involved an ecological

forestry pilot project, the court held that the project could not proceed based on an EA because

ecological forestry was controversial, 2015 WL 1190131 at *7-8, and would generate uncertain

effects, *id.* at *8-9, among other things.   The court thus concluded an EIS was necessary.   In

contrast, BLM designed the Lower Grave Project to be "similar to many forest management

projects implemented within the scope of the 1995 Medford ROD/RMP," and with the effects of

Project implementation "within the scope of those considered in the 1995 ROD/RMP."   AR

2922.   Notably, in advocating for ecological forestry, KSWild did not advocate for the

preparation of an EIS; rather, it asserted that BLM should have considered an ecological forestry

alternative in the EA, which is inconsistent with the holding in *Oregon Wild*.   Contrary to

*Oregon Wild*, the F&R recommends that approach to this Court.

        BLM, the expert land management agency, determined that including 62 acres of

regeneration harvest in the Project was consistent with the RMP's objectives for the forest lands

at issue and better tailored to the Project's purpose and need.   *See, e.g.*, AR 2759-60 (explaining

why ecological forestry and the retention of more older, larger trees was not given detailed

consideration).   In making that determination, BLM complied with NEPA.   *Earth Island*, 697

F.3d at 1022.   And as the *Earth Island* court observed, where an agency "'has properly

determined, through its decision not to [prepare an EIS, that a project] will have no significant

environmental effects,'" it makes no sense to require the agency to consider a litigant's

preference for an even lighter touch on the land.   697 F.3d at 1023 (quoting with approval *Sierra

Club v. Espy*, 38 F.3d 792, 803 (5th Cir. 1994)).   That is the posture of this case – BLM

Page-22 **DEFENDANT-INTERVENOR'S OBJECTIONS
TO THE MAGISTRATE'S FINDINGS AND
RECOMMENDATION**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201

determined (and KSWild does not dispute) that the Lower Grave Project will have no significant environmental effects.   On these facts, there is no cause to fault BLM for declining to give detailed consideration to KSWild's preferred alternative, which would further shrink the Project's already-insignificant commercial harvest component.   *See supra* pp. 4-8 (describing the evolution of the Project through the NEPA process, with the initially proposed 1,660 acres of commercial harvest shrinking by approximately 65% to just 582 acres).

Again, BLM is entitled to deference when determining which alternatives to consider in an EA.   *Ctr. for Biological Diversity*, 349 F.3d at 1169 n.9.   On this record, the Magistrate Judge erred in recommending that the Court should require BLM to disregard the direction in the RMP and give detailed consideration to KSWild's preferred ecological forestry approach for the 62 acres undergoing regeneration harvest.   The Court should reject the F&R's recommendation and instead conclude, as did the IBLA, 190 IBLA at 305-09, 2017 WL 5653735, at *7-9, that BLM's alternatives analysis complied with NEPA as a matter of law.

///

///

///

Page-23 **DEFENDANT-INTERVENOR'S OBJECTIONS
TO THE MAGISTRATE'S FINDINGS AND
RECOMMENDATION**

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201

## CONCLUSION

Based on these objections, and for the reasons set forth in Federal Defendants' objections, Murphy Company respectfully asks the Court to reverse the Magistrate Judge's F&R on the issue of the Lower Grave Project's compliance with NEPA's reasonable range of alternatives requirement. The Court should conclude that the Project's NEPA analysis considered a reasonable range of alternatives. The Court otherwise should adopt and uphold the Magistrate Judge's F&R under NEPA and FLPMA and enter summary judgment in favor of Murphy Company and Federal Defendants on all of KSWild's claims.

DATED this 6th day of March, 2019.

**HAGLUND KELLEY LLP**

By: ____/s/ Julie A. Weis_____
    Julie A. Weis, OSB No. 974320
    Michael E. Haglund, OSB No. 770230
    Christopher T. Griffith, OSB No. 154664
    Attorneys for Defendant-Intervenor Murphy Company

**CERTIFICATE OF SERVICE**

I hereby certify that on the 6th day of March, 2019, I served the foregoing

**DEFENDANT-INTERVENOR'S OBJECTIONS TO THE MAGISTRATE'S FINDINGS**

**AND RECOMMENDATION** with the Clerk of the Court using the CM/ECF system, which

will send notification of this filing to the attorneys of record and all registered participants.


/s/ Julie A. Weis
Julie A. Weis


**CERTIFICATE OF SERVICE**