Nicholas S. Cady (OSB # 113463)
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440
Tel: 541-434-1463
Fax: 541-434-6494
Email: nick@cascwild.org

Marianne Dugan, Attorney (OSB # 932563)
259 E. 5th Ave. Ste 200D
Eugene, OR 97401
Tel: (541) 338-7072
Fax: (866) 650-5213
mdugan@mdugan.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
MEDFORD DIVISION

| | |
|---|---|
| KLAMATH SISKIYOU WILDLANDS CENTER, an Oregon non-profit corporation; OREGON WILD, an Oregon non-profit corporation; and CASCADIA WILDLANDS, an Oregon non-profit corporation;<br><br>      Plaintiffs,<br>  v.<br><br>BUREAU OF LAND MANAGEMENT, an administrative agency of the United States Department of Interior,<br><br>      Defendant,<br><br>  and<br><br>MURPHY COMPANY,<br><br>      Defendant-Intervenor. | Civil No. 1:17-cv-997-CL<br><br>PLAINTIFFS' RESPONSE TO OBJECTION TO REPORT AND RECOMMENDATION |

Plaintiffs KS Wild, Cascadia Wildlands and Oregon Wild ("Plaintiffs") respectfully submit this response to the objections to the Report and Recommendations (R&R) entered in this case on March 6, 2019 submitted by the Bureau of Land Management ("BLM"), Dkt. No. 61, and Murphy Company, Dkt. No. 60. Plaintiffs agree with the Magistrate's R&R concerning the NEPA alternatives claim.

I. BLM's analysis of a single, reasonable alternative violates NEPA.

NEPA requires a federal agency to "study, develop, and describe appropriate alternatives" to a proposed project independent of whether the agency is preparing an EA or an EIS. 42 U.S.C. § 4332(2)(E); *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1229 (9th Cir. 1988); *see* 40 C.F.R. § 1508.9. Specifically within an EA, the agency must "study, develop, and describe appropriate alternatives to recommended courses of action." 42 U.S.C. § 4332(2)(E). Federal agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives to a proposed project." *Center for Biological Diversity v. Nat'l Highway Traffic Safety Admin*, 538 F.3d 1172, 1217 (9th Cir. 2008). The Ninth Circuit made clear in *Western Watersheds Project v. Abbey*, "[t]he existence of a viable but unexamined alternative renders an EA inadequate." 719 F.3d 1035, 1050 (9th Cir. 2013). "Viable" alternatives are those that are feasible, and meet the stated goals of the project or are reasonably related to the purposes of the project. *Id.* at 1052 ("Feasible alternatives should be considered in detail."); *see also* Forty Most Asked Questions Concerning CEQ's NEPA Regulations, 48 Fed. Reg. 18,026 (March 16, 1981).

The R&R found that in some instances a no-action alternative and a single proposed action can satisfy this NEPA alternatives requirement. Dkt. No. 57 at 10 (citing *Center for Biological Diversity v. Salazar,* 695 F.3d 893 (9th Cir. 2012)). In *Center for Biological Diversity v. Salazar,* the Ninth Circuit found that a no-action alternative and a single proposed action

alternative satisfied the requirements of 42 U.S.C. § 4332(2)(E) because the no-action alternative was "a viable and reasonable alternative that was discussed and considered in depth by the agency." *Id.* at 10.

Here, similarly, the BLM analyzed only two alternatives, a no-action alternative and the recommended, preferred alternative. AR09837. However, unlike *Center for Biological Diversity v. Salazar,* the BLM here admits that the no-action alternative does not meet the purpose and need of the project, and is therefore not feasible. Dkt. No. 57 at 11 (citing AR 2689). The Court determined that because the no-action alternative was not feasible in light of the purpose and need of the project, the BLM had not proffered any "alternatives to recommended courses of action," in violation of NEPA's requirement. *Id.*; 42 U.S.C. § 4332(2)(E).

The BLM objects to the Magistrate's R&R by arguing that there is no requirement that the no-action alternative fulfill the purpose of a proposed project, Dkt. No. 61 at 13 (citing *Agdaagux Tribe of King Cove v. Jewell*, 128 F. Supp. 3d 1176, 1195 (D. Alaska 2015), and that the main purpose of the no-action alternative is to establish a project baseline. Dkt. No. 61 at 20 (citing *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 642 (9th Cir. 2010). While this may be the case, if a no-action alternative does not satisfy the purpose and need, it is not a viable alternative, and therefore cannot satisfy the statutory requirement that the agency analyze an alternative other than the proposed action. 42 U.S.C. § 4332(2)(E).

Neither the BLM nor the Intervenor disagrees with that here, the BLM only analyzed a single, reasonable alternative. Only analyzing a single alternative violates 42 U.S.C. § 4332(2)(E) as well as guidance in the Ninth Circuit requiring the BLM in an EA to analyze "reasonable alternatives," plural. *Ctr. for Biological Diversity v. Salazar,* 695 F.3d 893, 915

(9th Cir. 2012) (quoting *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008)).

If the BLM had framed the purpose and need for the project more broadly (say, *e.g.*, for watershed health), the no-action alternative could have been reasonable and viable and thus satisfied NEPA's alternative requirement. But because the BLM exercised its discretion in framing the purpose and need for the project as conducting active management to generate commercial timber volume, AR09833, a no-action alternative that does not meet this purpose and need is inherently insufficient. *See* Dkt. No. 57 at 11.

II.  BLM failed to consider a reasonable alternative to its proposed action.

The Magistrate found that the BLM violated NEPA's alternative requirement in a second way. Dkt. No. 57 at 13-14. Plaintiffs, pursuant to the BLM's purpose and need, suggested an alternative that involved active management and would generate commercial timber volume through commercial thinning, or dry-forest Ecological Forestry, instead of regeneration harvest. *See.* Dkt. No. 57 at 11-12; AR14996-15008; AR08779; AR07746; AR02533-80. Plaintiffs made the case that such an alternative would minimize impacts to threatened owls and their habitat, retain more old-growth legacy trees, generate a sustainable amount of commercial timber, and that it would also specifically cater to the dry forest type of the project area to reduce, rather than increase, fire risk. AR02537; *see* Dkt. No. 57 at 12. In doing so, this alternative would arguably do a better job of satisfying the project's purpose and need than the BLM's single proposed action alternative. *See* AR09833 (regarding the agency's stated desire for this project to increase quality and vigor of remaining trees, "enhance structural complexity and composition," "increase resistance of the landscape to fire," and "maintain stand vigor").

The Magistrate found that the BLM did not determine on the record that "the Ecological Forestry Alternative was unfeasible, ineffective, or inconsistent with other policy objectives." Dkt. No. 57 at 13. Both the BLM and Intervenor vigorously contest this point, but neither cites to the record, instead citing *post-hoc* representations in the litigation briefing. The Magistrate points out that, in the record, BLM admitted "that an Ecological Forestry approach satisfies the same or similar goals as the proposed Lower Grave project." Dkt. No. 57 at 12 (citing AR 2704). Because the record demonstrates that Plaintiffs' proffered alternative was reasonable,[1] the BLM's failure to analyze this alternative is a violation of NEPA. *Western Watersheds Project v. Abbey*, 719 F.3d at 1050 (holding the BLM has an obligation to consider reasonable alternatives, and failure to do so renders an EA inadequate).

Both the Intervenor's and the BLM's objections mistakenly attempt to frame Plaintiffs' alternatives claim as a challenge to the BLM's decision to apply the Northern General Forest Management Area regeneration harvest prescriptions. *See* Dkt. No. 61 at 16; Dkt. No. 60 at 18. This is a mischaracterization of Plaintiffs' claim and of Plaintiffs' requests to the BLM during the NEPA process. Plaintiffs asked the BLM to consider an alternative that specifically caters to the dry-forest type in the project area by retaining more of the older, residual legacy trees (trees over 150 years in age) to increase stand resiliency in the face of potential wildfire. AR01720. It is the failure of the BLM to consider just such an alternative that is at issue here. Dkt. No. 57 at 11-12; *see* Dkt. No. 14 at 21 ¶ 76(a) (first amended complaint). The BLM asks the Court to "defer to BLM's interpretation and application of its own land management allocations and directives," but that is not the question this Court is asked to analyze. Dkt. No. 61 at 23.

---

[1] Reasonable alternatives are "viable, feasible, meet the stated goals of the project, or are reasonably related to the purposes of the project." *Western Watersheds Project v. Abbey*, 719 F.3d at 1052.

To elaborate, in response to BLM's arguments in the protest response that the "RMP does not require the analysis of an Ecological Forestry Alternative" that would retain more old fire-resistant trees, AR26703, Plaintiffs point out in their opening brief that the BLM has explicit discretion in the RMP to apply Southern (as opposed to Northern) General Forest Management Area logging prescriptions which would result in more old tree retention. *See* Dkt. No. 31 at 25-26 (RMP direction on whether to apply Southern v. Northern prescriptions is "flexible" and "there will be local situations in the northern GFMA that should be managed along southern GFMA prescription guidelines and visa versa. AR24784."). The Medford District's RMP explicitly considers a different prescription in regeneration harvest units for dry forest stands, a prescription that retains more of the larger legacy trees that are resilient to fire and necessary for the function of spotted owl nesting, roosting and foraging habitat. AR24784.

Plaintiffs' point is that the BLM has the discretion to adjust logging prescriptions to match local, on-the-ground conditions. In the matrix land use allocation, BLM has the discretion to apply thinning ("partial harvest") or regeneration harvest. AR24750. Even within regeneration harvest units, the direction in the RMP is "to retain *at least* 6 to 8 green conifer trees per acre in regeneration harvest units." AR24785 (emphasis added). That is a floor for retention. Additional retention can be added, for example to "minimize soil and litter disturbance," *id.,* "to provide habitat diversity," to "[r]etain snags and trees within a timber harvest unit at levels sufficient to support species of cavity-nesting," and "to reduce the risk of stand loss from fires, animals, insects, and diseases." AR24783-4. Rarely do Plaintiffs spend time in their briefs espousing the vast degree of discretion the BLM has in implementing its RMP. Defendant's litigation position, that an alternative that retains more fire resilient large trees is "outside the Resource

Management Plan management framework," is so far-fetched that Plaintiffs find themselves in the unlikely position of emphasizing BLM's own timber sale planning discretion.[2]

   III.    BLM's representations about extra-record evidence are irrelevant and incorrect.

BLM requested in the briefing that the Court consider an IBLA appeal to a previous, unrelated timber sale, and argues that because the Court declined to consider its extra-record evidence in that case, that "this Court should decline to adopt the R&R." Dkt. No. 61 at 27-31. BLM is arguing that conservation advocacy not in the record must bind Plaintiffs here.

As an initial point, BLM acknowledges that a court's consideration of extra-record evidence is permissive, "this Court *may* take judicial notice," and therefore the Magistrate's failure to take notice here cannot be a basis of judicial error. Dkt. No. 61 at 22 (citing *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006)). Second, the Magistrate acknowledged that the IBLA appeal involved an "unrelated" timber project, and "therefore finds that it is outside the scope of this Court's review." Dkt. No. 57 at 13 fn. 2. A similar argument was made in *Cascadia Wildlands v. Scott Timber Co.,* where defendant argued that a public policy position in other administrative contexts should bind plaintiffs in that action. 328 F. Supp. 39 1119, 1132-3 (D. Or. 2018). The court found that that "contention is irrelevant and incorrect." *Id.* at 1133. It was "irrelevant" because "defendants have not argued that collateral estoppel, judicial estoppel, or any other doctrine prevent plaintiffs from taking a contrary position here." *Id.* Similarly here, BLM does not make any contention that some

---

[2] Even Intervenor acknowledges the fact that the BLM has the ability to require the retention of additional trees per acre. Dkt. No. 60 at 10. Intervenor does misrepresent the record here, citing a preliminary Biological Assessment to make conclusions about the project's ultimate level of retention. *Id.* (citing AR07184). The project decision states that "[a]pproximately 6-8 trees per acre would be retained." AR02697. In any case, the Intervenor acknowledges BLM's authority to increase tree retention levels in units.

Plaintiffs' Response to Objections to the Report & Recommendation – Page 6

estoppel doctrine applies, and never proffers a standard for any of these doctrines, much less argues that they have been satisfied.

But more importantly, BLM's representations about Plaintiffs' position are incorrect. The IBLA appeal (Dkt. No. 34-1) related to the East West Junction timber sale. There, Plaintiffs were contending that the BLM was attempting to wrongly apply wet-forest Ecological Forest logging prescriptions (regeneration harvest) to a dry-forest. Dkt. No. 34-1 at 17. With consequences that would likely be very similar to the present case, the BLM would be removing large-diameter conifer trees in a dry-forest type and in the process drastically increasing fire hazard and risk. *Id.* at 15. Plaintiffs argued in that IBLA appeal that it was impermissible for the BLM to apply *wet-forest Ecological Forestry techniques* (regeneration harvest) under the RMP, Dkt. No. 34-1 at 9, because the proposed logging would violate per-acre tree retention standards. *Id.* at 14-15 (BLM "failed to retain trees in the larger size classes as required by the RMP"). Plaintiffs in fact urged the BLM in East West IBLA appeal to consider applying "dry-forest" "Ecological Forestry" techniques that include "some combination of density management, radial thins, pre-commercial thin of young conifers, and fuels reduction but no regeneration harvest." *Id.* at 17. Defendant's representations about Plaintiffs prior position are simply incorrect. As in *Cascadia Wildlands,* Defendant's arguments concerning these extra-record site-specific conservation advocacy positions by Plaintiffs are both "irrelevant and incorrect." 328 F. Supp. at 1133.

BLM similarly represents that Plaintiffs' argument in *Oregon Wild v. BLM* — that a regeneration harvest Ecological Forestry project in a dry-forest required an EIS — somehow renders Plaintiffs' request that the BLM commercially thin and retain more old trees, AR07746, a "controversial experimental approach" that is "inherently impracticable." Dkt. No. 61 at 29, 31; No. 6-14-cv-110-AA, 2015 WL 1190131 (D. Or. March 14, 2015). Again,

Plaintiffs' prior arguments are not relevant here, and even if they were that is no conflict, because Plaintiffs are consistently objecting to regeneration harvest in old, dry forests that increases fire hazard and risk.

Additionally, the BLM's claim that application of dry-forest Ecological Forestry techniques is "impracticable" is contradicted by the record. The Court notes that in other portions of the Lower Grave project, the BLM proposed applying dry-forest Ecological Forestry techniques. Dkt. No. 57 at 12 (citing 281). Given that the BLM is applying these techniques on other Lower Grave project matrix lands, these techniques cannot be "inherently impracticable." BLM's arguments have no basis in the record.

The BLM, in a complete reversal from above, also argues that "because the proposed Lower Grave alternative was, overall, similar to Ecological Forestry" that it need not consider it. Dkt. No. 61 at 31. The Magistrate explicitly addressed this point. It found that the fact that an Ecological Forestry alternative and the proposed Lower Grave project have "[o]verlapping goals and strategies do[es] not necessarily mean that the proposed alternatives are similar." Dkt. No. 57 at 12. The Magistrate notes that "[t]he primary difference between Plaintiffs' Ecological Forestry suggestion and the BLM's preferred action alternative is that a dry-forest project would retain more of the older, residual legacy trees (trees over 150 years in age)." *Id.* Intervenor specifically highlights the fact that this proposed alternative would "retain more than twice as many trees." Dkt. No. 60 at 7.

In another significant point related to fire impacts, the Magistrate notes that the BLM's proposed regeneration harvest would increase fire hazard in the short term, and also "represent a shrub fuel model with an increased fire behavior potential as vegetation occupies the site." Dkt. No. 57 at 12 (citing AR02697). This increased fire hazard would remain until the BLM again

logs the site and restarts the cycle. *Id.* The BLM on the other hand claims that there "is no evidence in the record that Ecological Forestry differs [from the proposed action] with regard to fire risk such that NEPA required that BLM consider it as a standalone alternative." Dkt. No. 61 at 33. That is not true.

In fact, the record contains a white paper that discusses Ecological Forestry techniques in dry-forests at length. AR01694-01739. The paper reveals that the application of traditional timber harvesting and plantation establishment, such as the Lower Grave regeneration harvest treatments ("typical of forest management activities that have occurred in the Lower Grave Watershed," Dkt. No. 61 at 29-30 (citing 10055)), has resulted in: "(1) fewer old trees of fire-resistant species, (2) denser forests with multiple canopy layers, (3) more densely forested landscapes with continuous high fuel levels, and, consequently, (4) more stands and landscapes highly susceptible to stand replacement wildfire and insect epidemics (e.g., Hessburg et al. 2005, Noss et al. 2006, Johnson and Franklin 2012)." AR01702. Ecological Forestry techniques on the other hand would shift forest composition to be more fire and drought tolerant, *id.,* and are specifically designed to address increasing fire risk in southwestern Oregon. AR01697. BLM's contention that there is no comparison on fire risks between the two alternatives in the record is false. In any case it is not Plaintiffs' burden to specifically lay out alternatives for the BLM, *Oregon Wild v. Bureau of Land Mgt.,* 6:14-CV-0110-AA, 2015 WL 1190121, at *13 (D. Or. Mar. 14th, 2015) *appeal dismissed,* 15-35336, 2017 WL 1960413 (9th Cir. May 11, 2017), much less to conduct the alternative analysis. The Magistrate explicitly notes that the BLM's failure to analyze an Ecological Forestry alternative results in a failure to conduct a meaningful comparison of the differences, and thus "neither the agency nor the public can participate in the informed decision-making process contemplated by NEPA." Dkt. No. 57 at 13.

And if this Court is to consider here representations made by the parties in other timber sales, recent fire analysis by the BLM can shed light on the vague statements the agency makes here related to fire. In its analysis of the fire impacts of regeneration harvest proposed in the Thurston Hills Vegetation Management Project,[3] the BLM admitted that the traditional regeneration harvest[4] proposed "would create an increase in fire hazard at the stand level for the next 40 years as stands regrow and transition through progressive structural stages." Thurston Hills EA at 10. The BLM is vague about this timeline in the Lower Grave EA, stating that the regenerated areas will experience "increased fire behavior potential as vegetation occupies the site." AR02697. The BLM claims that this fire behavior will eventually decrease, but never specifies the timing. As revealed in the Thurston Hills EA, the decrease in fire behavior would not be expected for a period of at least 40 years. Intervenor's statement that "it simply is incorrect to say that regeneration harvest treatments 'increase fire hazard'" is not supported by the evidence in the record or extensive other analysis conducted by the BLM itself. Dkt. No. 60 at 10.

BLM also argues that it did not need to consider an Ecological Forestry alternative because it "presented a management distinction for only a small fraction – 6% -- of the Lower Grave project." Dkt. No. 61 at 32. First, the BLM provides no caselaw to support this position,

---

[3] Thurston Hills Non-Motorized Trails and Forest Management Project Environmental Assessment (April 2018), Document No.: DOI-BLM-N050-2017-0006-EA, (Thurston Hills EA) accessed online at: https://eplanning.blm.gov/epl-front-office/projects/nepa/75350/142227/174633/2018_04_23_THills_EA_Final_Print.pdf on March 15, 2018.
[4] The regeneration harvest proposed in Thurston Hills is even less intensive than that proposed in Lower Grave. Thurston Hills will retain a floor of 5% live trees in the logging units. Thurston Hills EA at 24. Even assuming the BLM retains the maximum amount of trees contemplated across all regeneration unit acres, it will leave approximately 2% live trees in the logging units. *See* AR10036 (the regeneration harvest units contain 520 trees per acre) and the BLM could retain at the highest possible estimation 12 trees per acre (Dkt. No. 60 at 23 (citing AR07184)).

Plaintiffs' Response to Objections to the Report & Recommendation – Page 10

because many alternatives considered by the agency can involve relatively minor alterations. *See Western Watersheds Project v. Abbey,* 719 F.3d 1035, 1054 (9th Cir. 2013) (the analyzed alternatives all contemplated the same amount of grazing, but differences in range improvements such as installing or removing fencing). Second, Plaintiffs' concerns surround the 62 acres of proposed regeneration harvest out of 582 acres of commercial harvest. AR02681. This is not 6%, but over 10% of the proposed logging, and approximately 19% of the project's timber volume. *See* AR05144-52 (regeneration harvest amounts to 1800 of the 9,446 MBF). And most importantly, this difference is incredibly important to the Intervenor Murphy Company (the timber purchaser), to Plaintiffs who visit and recreate in these areas, and to the BLM that is adamantly refusing to even consider converting the regeneration harvest acres to a lighter prescription.

Intervenor claims in its brief, ironically in the section titled "Factual Corrections," that the Lower Grave project was collaboratively developed. This is simply not true. Dkt. No. 60 at 8. In fact, one of the public's primary complaints associated with the Lower Grave project was the BLM's failure to develop this project through a collaborative process. AR10046. BLM argues in response that "it is not realistic to visit every area proposed for treatment with each concerned citizen" and that the BLM will "continue to provide opportunities to engage" but only "as required by NEPA," and that ultimately "the agency has the discretion to determine how much and what kind of involvement works best." *Id.* at 10046-7. The BLM even goes so far as to describe the questions developed by the Grave Creek Watershed Citizens Association as an "unsolicited, crappy request." AR10467.

## CONCLUSION

For these reasons and those stated in Plaintiffs' summary judgment briefing, the Court should overturn the R&R as it relates to the Plaintiffs' supplementation, hard look and FLMPA claims; affirm the R&R as it relates to Plaintiffs' alternatives claim; vacate the Lower Grave EA and DR/FONSI; and remand to the agency.

Respectfully submitted and dated this 19th of March, 2019.

/s/ Nicholas S. Cady
Nicholas S. Cady, OSB #113463
P.O. Box 10455
Eugene, Oregon 97440
Tel: (541) 434-1463
nick@cascwild.org
*Attorney for Plaintiffs*

/s/ Marianne Dugan
Marianne Dugan, Attorney (OSB # 932563)
259 E. 5th Ave. Ste 200D
Eugene, OR 97401
Tel: (541) 338-7072
Fax: (866) 650-5213
mdugan@mdugan.com

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Oregon by using the Court's CM/ECF system on March 19, 2019. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the District Court's CM/ECF system.

/s/ Nicholas S. Cady
Nicholas S. Cady, OSB #113463
P.O. Box 10455

Eugene, Oregon 97440  
Tel: (541) 434-1463  
nick@cascwild.org  
*Attorney for Plaintiffs*

# CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2 because it contains less than 11,000 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, and signature block.

/s/ Nicholas S. Cady  
Nicholas S. Cady, OSB #113463  
P.O. Box 10455  
Eugene, Oregon 97440  
Tel: (541) 434-1463  
nick@cascwild.org  
*Attorney for Plaintiffs*